## YELLOW POPLAR LUMBER CO. v. CHAPMAN.

(Circuit Court of Appeals, Fourth Circuit. May 5, 1896.)

### No. 143.

1. PRACTICE—BILLS OF EXCEPTIONS—TIME OF SIGNING.

On the day when a verdict was rendered for a plaintiff, motions made by the defendant to set aside the verdict and grant a new trial were continued until an adjourned term of the court, and at such term further continued until another adjourned term, at which the motions were overruled, and judgment entered for the plaintiff. At the same time, by formal order, the defendant's time for preparing bills of exceptions was extended to the first day of the next regular term. On that day, and again on the next day, the defendant's time was further extended, in each case by formal order, against the plaintiff's objection. On the last day fixed, the bills of exceptions were presented by the defendant, and, on motion of the plaintiff, on that day, and again on two subsequent days, consideration of them was postponed by formal order. On the day last fixed, objections to the bills of exceptions were argued, the matter again continued, by formal order, to the next day, on which the bills were signed and sealed by the court. Held, that the court never lost control

of the matter of the preparation and signing of the bills of exceptions, and the same were regularly allowed, and properly in the record of the cause on writ of error.

**2. CONTRACTS—INTERPRETATION.**

Plaintiff made a written contract with defendant, on February 9, 1893, to deliver to it, at certain designated points on two rivers, 50,000,000 feet of timber, to be cut from certain trees owned by him; the first yearly settlement to be made at the end of the June season of 1894, and 10,000,-000 feet, or more, to be delivered each year. In an action by plaintiff for damages for being prevented by defendant from carrying out the contract, *held*, that plaintiff's obligation to deliver at least 10,000,000 feet of timber annually was absolute; the year, however, being considered as terminating with each June season in and after 1894, and, accordingly, that an instruction that, if plaintiff could not have delivered 10,000,000 feet by February 9th, in each year, the defendant must recover, was properly refused; but it was error to instruct the jury that, if the plaintiff could not, "with such agencies as he could command, considering tides," have delivered 10,000,000 feet annually, the defendant must recover.

**3. PLEADING—ASSUMPSIT—SPECIAL PLEA.**

*Held*, further, that in the action, which was assumpsit, a special plea should have been allowed, which set up that the defendant, under the terms of the contract, was still in the performance of the same, according to a stipulation that, upon plaintiff's neglect, defendant might do the work, and that the plaintiff was barred from maintaining any action until the completion of such performance.

**4. SALES—MEASURE OF DAMAGES.**

In an action for failing to receive timber, under a contract for its sale and delivery at certain points, the proper measure of damages is the difference between the contract price of such timber and its market value, at the place where it was to have been delivered, or, if the defendant had entire control of the market there, at the nearest available market, less the additional cost of delivery at such market; and the rule applying to cases of contracts to furnish materials and do work, allowing the difference between the contract price and the cost of preparing the timber for delivery, with an allowance for the lost time, and release from care and risk, does not apply.

In Error to the Circuit Court of the United States for the Western District of Virginia.

J. N. Baldwin and W. A. Ayers (Connally F. Trigg, on briefs), for plaintiff in error.

J. F. Bullitt, Jr., and A. H. Burroughs (R. A. Ayers, J. L. Kelly, Chase & Dameron, and E. M. Fulton, on briefs), for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

GOFF, Circuit Judge. On the 9th day of February, 1893, S. F. Chapman, the defendant in error, of Asheville, N. C., entered into a contract with M. T. Green, of Illinois, and F. J. O'Connell, of Ohio, by which he agreed to deliver to them, in the Russell fork of Sandy river, at the mouth of Elkhorn, and in the Levisa fork of said river, at the mouth of Dismal creek, 50,000,000 feet of poplar timber, on the terms and conditions mentioned in said contract, which was in writing and which is here set forth in full, in order that the questions involved in this case, and now to be

passed upon by the court, may be more easily comprehended and appreciated. The contract is as follows, to wit:

"It is hereby agreed, by and between S. F. Chapman, of Asheville, N. C., party of the first part, and M. T. Green, of Chicago, Illinois, and F. J. O'Connell, of Coal Grove, Ohio, parties of the second part, that for and in consideration of prices hereinafter named, and the advancement to said S. F. Chapman of the notes hereinafter referred to, said S. F. Chapman hereby agrees and binds himself to deliver to said M. T. Green and F. J. O'Connell, in the Russell fork of Sandy river, at the mouth of Elkhorn creek, and at the Levisa fork of the Sandy river, at the mouth of Dismal creek, fifty million feet of the timber that he owns, or had in any way control of, being a portion of 42,000 trees that are bought in the style of Albert Pack, trustee, and also 32,000 trees that are owned and controlled by S. F. Chapman as an individual, both on the Russell and Levisa forks of the Sandy river. All logs are to be delivered in the river below the mouth of Elkhorn on the Russell fork, and of Dismal creek on the Levisa fork: provided, that should the trees above referred to fall short of said fifty million feet, then said Chapman agrees to make up the shortage in a manner satisfactory to said Green and O'Connell. In consideration of carrying out this contract, the said M. T. Green and F. J. O'Connell agree and hereby bind themselves—First, to pay on all clear logs 25" and up, $9.50 per thousand, Doyle's rule; second, 20" to 24" inclusive, $7.00. No. 2 log shall be a log not up to grade of No. 1, but must be free from rots, wind-shakes, and hollows; in short, No. 2 logs must be merchantable timber, and bearing not over four knots. All logs are to be measured at the small end, average diameter, and no log shall be less than 20" at the tip, regardless of length. Logs must be 12', 14', and 16', or their multiples. Logs 12' to 16' long are to have 4" to equalize lengths. Multiples of 12', 14', and 16' are to have 8" to equalize lengths. Said M. T. Green and F. J. O'Connell agree to make measurements every thirty days on the pits at the creek banks, where the timber is hauled by said Chapman, and on these measurements they are to pay $6.00 on No. 2 logs, and $7.00 on No. 1 logs, per M., respectively, on the contract; the balance to be paid when the logs are delivered at the points above agreed upon. Settlements to be made every sixty days, at $6.00 on No. 2 logs and $7.00 on No. 1 logs per M., and to be closed with four months' acceptances, indorsed by the Yellow Poplar Lumber Company. The first yearly settlement shall be made after the June season of 1894. Logs left over in the creek are to be measured, and, after deducting the amount of remeasurement from the original measurement, on which advance is made, the difference shall determine the amount of logs delivered. Logs left over shall be subject to two measurements,—one to determine the amount delivered, the other to ascertain the damage to logs left over, if any; which number of feet of damaged logs would be deducted from S. F. Chapman's original measurement, or, if already credited, charged back to him. S. F. Chapman agrees to measure with his own loggers, and then M. T. Green and F. J. O'Connell will measure with S. F. Chapman. S. F. Chapman binds himself to pay his haulers and all men employed in the logging interests through orders on the store to be run by M. T. Green and F. J. O'Connell, as far as they need merchandise, at such a point as they see fit and deem expedient and most practicable in the district. One store will be operated on the Russell fork, and one on the Levisa fork. S. F. Chapman agrees not to run any store, or have any interest in one, to the detriment of said M. T. Green and F. J. O'Connell. Said M. T. Green and F. J. O'Connell agree to issue supplies to the loggers up to such an amount as ordered by Chapman, provided it is due S. F. Chapman. Said M. T. Green and F. J. O'Connell also agree to execute their two straight notes for $5,-000.00 each at ninety days and four months, one dated February 6, 1893, and one of even date herewith, with the distinct understanding that these two notes are to be renewed; and ten per cent. of measurements is to be deducted monthly by said Green and O'Connell, to be applied towards the payment of said notes. And said S. F. Chapman agrees that he will use the proceeds of these notes to satisfy certain claims in the way of purchase money between himself and former partner, C. D. Cushing, for the release

of a certain bill of sale of his interest in said 42,000 trees made by him to George W. Pack. Said S. F. Chapman further agrees, and is hereby obligated, to put in ten million feet, or more, of said timber a year, and in case he neglects or fails to complete or carry out this contract, then it will become the duty and right of said M. T. Green and F. J. O'Connell to proceed to carry out this contract, and to cut, haul, and deliver into the creeks the logs from the trees belonging to S. F. Chapman, and all the expenses entailed thereby are to be charged against said S. F. Chapman; and, should anything remain after this has been done, the residue will revert to S. F. Chapman.

"In witness whereof, the said S. F. Chapman, party of the first part, and M. T. Green and F. J. O'Connell, parties of the second part, have hereunto set their hands this 9th day of February, A. D. 1893.

"S. F. Chapman,
"M. T. Green,
"F. J. O'Connell.

"In the presence of R. De V. Carroll."

The said Green and O'Connell represented the Yellow Poplar Lumber Company, and the contract was for its use and benefit, of which Chapman was fully advised. Soon after the execution of the contract, work thereunder was commenced, and continued until during September, 1893, when the misunderstandings between the parties concerning the same became so serious that all operations ceased. As is usual under such circumstances, the parties in interest did not agree as to the cause of their difficulties, nor as to who was to be liable for the damages, if any, caused thereby. Chapman claimed that the contract had been, with the consent of the parties thereto, modified in three particulars, as follows: First. Instead of two $5,000 notes, that two drafts, of $5,000 each, should be drawn by Green and O'Connell on the Yellow Poplar Lumber Company, and accepted by it, in favor of Chapman. Second. That Chapman should run and manage the stores referred to in the contract, he to have one-third of the profits realized from their operations. Third. That the Yellow Poplar Lumber Company, after the work under the contract had commenced, agreed to release Chapman from his obligation to renew the two $5,000.00 drafts. The Yellow Poplar Lumber Company admitted the modifications as claimed in the first and second particulars, but denied the change as claimed in the third instance. Chapman, who insisted that he had been prevented from carrying out the contract by the action of the company, instituted a suit in equity in the circuit court of Wise county, Va., in September, 1893, against Green, O'Connell, and said company, demanding damages, and praying for the seizure of defendant's property for the purpose of satisfying the same. Jurisdiction in equity was claimed on three grounds—First, because the accounts between the parties were complicated and mutual; second, as the defendant had violated the contract, the plaintiff was entitled to have a deed by which he had conveyed the timber mentioned in the contract to the defendants set aside, and said property reconveyed to him; and, third, under the provisions of the Virginia statutes, any one having a claim against a nonresident who has property in that state can bring suit in equity against such nonresident, and sue out an attachment of such property. Soon after the suit had been instituted, the de-

fendants, under the acts of congress relating to such matters, filed a petition in said court, asking for the removal of the case into the circuit court of the United States for the Western district of Virginia, which was done. It will not be necessary to set forth in detail the proceedings had in said cause, except in a few particulars, as the same are not involved in the questions to be passed upon at this time. It is proper to state that, in disposing of the demurrer to the bill, the judge, being of opinion that there was a misjoinder of legal and equitable causes of action, directed that the plaintiff file, on the law side of the court, a declaration, for the purpose of prosecuting his claim for damages against the defendant on the breaches of the contract, as charged. Such declaration was duly filed, defendant pleaded, issue was joined, and a trial had, the jury returning a verdict for the plaintiff. To the action of the court during the trial, in admitting and rejecting evidence, many exceptions were noted, and four bills of exceptions granted. Judgment was duly entered for the plaintiff, and a writ of error allowed.

The assignments of error are numerous, but we only find it necessary to consider and dispose of a few of them. There are no errors assigned as to the matters referred to in the bills of exceptions 1 and 2, the plaintiff in error having, in effect, abandoned them. The defendant in error insists that the assignments of error based upon bills of exceptions 3 and 4 should not be considered by this court, for the reason that the said bills were not allowed by the court below within the time and under such circumstances as make them properly a part of the record of this cause.

It is now a rule of practice universally followed in the courts of the United States that an exception to the ruling of a trial judge cannot be considered in the appellate court, unless it was duly noted during the trial, and preserved in a bill of exceptions, which was presented to and allowed by the court at the term during which the trial was had, or within a time provided for by an order entered during such term; or where it has been allowed under the standing rules of the court, or with the consent of the parties, or under such circumstances as clearly show that it was the intention of the court to, and that it did, retain by special order the control of said matter, for the purpose of examining, allowing, and signing the said bill of exceptions. In this case it appears that the bills of exceptions marked No. 3 and No. 4 were examined and signed by the judge during the next regular term of the court convening after the trial, and therefore they were improperly allowed, unless he was authorized so to act by some provision made therefor under the rule of practice we have just referred to. The record discloses the following facts relative to the execution of these bills of exceptions, viz.: On the 23d day of November, 1894, the jury returned a verdict in favor of the plaintiff, and the defendant moved the court to set aside said verdict and grant a new trial; and the court not then being advised of its judgment, and desiring further time to consider the same, the said mo-

tion was continued until an adjourned term of the court, to be held on the 12th day of December, 1894. On the 14th day of December, 1894, the following order was entered:

"The motion to set aside the verdict and grant a new trial, made in this case November 23, 1894, and continued to an adjourned term of this court, to be held on the 12th day of December, 1894, is now, on motion of the defendant, alleging a want of time to prepare evidence on said motion, and the plaintiff, by counsel, consenting thereto, further continued to an adjourned term of this court, to be held at Abingdon on Wednesday, the 23d day of January, 1895."

At such adjourned term, on said 23d of January, 1895, the court overruled the motion for a new trial, and entered judgment for the plaintiff for the sum of $45,000, his damages as assessed by the verdict of the jury, with interest thereon from date until paid, and his costs by him about his suit expended. The order then made has the following reference to the bills of exceptions, to wit:

"And the defendant not now having time for the preparation of the bills of exceptions to said rulings, time for preparing the same is by order, on motion of the defendant, extended to the first day of the next regular term of this court, to be held in May, 1895."

On the 7th day of May, 1895, at the regular term of said court, the following order was entered of record, viz.:

"This day came the parties, by their attorneys, and the court having heretofore, to wit, on the 23d day of January, 1895, entered an order herein giving the defendant until the first day of this term to prepare bills of exceptions herein, for good cause shown, it is this day ordered that the time for the preparation and filing of said bills of exceptions be extended until to-morrow, to which time the further hearing of this cause is continued."

On the 8th day of May the following order was passed by the court, viz.:

"The court having, on the 7th day of May, 1895, on motion of the defendant, by counsel, and against the objection of the plaintiff, by counsel, extended the time for the preparation of the bills of exceptions herein until this, the 8th day of May, 1895, now, on this 8th day of May, 1895, came the defendant again by counsel, and moved the court that the time for the preparation of said bills of exceptions be extended to the 22d day of May, 1895, to which motion the plaintiff, by counsel, objected. On consideration of which it is ordered by the court that said motion be allowed, and that the time for the preparation of said exceptions be extended to the 22d day of May, 1895."

As entered on said 22d day of May, the following order is found in the record, to wit:

"This day came the parties, by their attorneys, and the time for filing the bills of exceptions in the cause having been extended until this, the 22d day of May, 1895, the defendant, by its counsel, presented to the court its bills of exceptions number three and number four, and, on motion of the plaintiff, by his attorney, the further consideration of said bills of exceptions is postponed until the 24th day of May, 1895, in order that the plaintiff may have time to examine the same; it appearing to the court that the plaintiff has not had an opportunity to examine said bills of exceptions until this day."

On the 24th day of May this entry was made, viz.:

"The court having, by order entered herein on the 22d day of May, 1895, extended the time for the consideration of the bills of exceptions presented by the defendant until the 24th day of May, 1895, now, on further motion of the plaintiff, by his counsel, and for reasons appearing to the court, the time

for the consideration of said bills of exceptions is extended until Tuesday. the 28th day of May, 1895, until which day this cause is continued."

On May 28th, the plaintiff asking for time, this order was passed:

"The court having, by order entered herein on the 24th day of May, 1895, extended the time for the consideration of the bills of exceptions presented by the defendant until the 28th day of May, 1895, now, on further motion of the plaintiff, by his counsel, and for reasons appearing to the court, the time for the consideration of the said bills of exceptions is extended until Wednesday, the 29th day of May, 1895, until which day this cause is continued."

On the 29th of May the following entry was made, viz.:

"The court having heretofore, on the 28th day of May, 1895, extended the time for the consideration of the bills of exceptions of defendant to the 29th day of May, 1895, now, on this day again came the parties, by their attorneys, and thereupon plaintiff, by his attorneys, presented to the court his objections to said bills of exceptions, and same was argued by counsel. Thereupon, for good cause appearing to the court, the time for the further consideration of said bills of exceptions is extended to Thursday, the 30th day of May, 1895, to which time this cause is continued."

And finally, on May 30, 1895, the court disposed of the matter with the following order, viz.:

"This day again came the parties, by their attorneys, and the court, having fully considered the bills of exceptions numbers three and four herein, and finding the same in all respects correct, doth approve, sign, and seal the same, and order that said bills of exceptions be filed and made part of the record hereof."

It does not appear from this record that the court below ever lost control of the matter of the preparation and signing of the bills of exceptions. There was no standing rule of the court applicable to the same, so a special order was resorted to every time that a postponement was granted. If the court could properly postpone, until the succeeding regular term, the consideration of the bills of exceptions by its standing rule or by its order of record,—and this seems to be conceded, the authorities showing that the practice is not unusual,—then surely, as long as it keeps control of the matter so postponed by due and orderly procedure, it may adjourn the hearing of the same until the matter is properly and fairly disposed of. It was evidently the intention of the trial judge to take such steps, and make such orders, as would preserve the rights of the defendant below to have the bills of exceptions prepared, signed, and made part of the record. That the court had the power to so extend the time until the "next regular term" is without doubt. The insistence of the defendant in error, that the matter should have been closed on the day of the "next term" to which it was postponed, and that the court had no power to continue it further, is without real merit, and is not supported by the reasoning of the courts in the cases cited. Again, so far as this matter is concerned, the cases relied upon by the defendant in error are not applicable, as the orders we now consider were all entered in term, when the court had full control of the subject, and none of them in vacation. The record also discloses that the plaintiff below objected several times to the orders of continuance, and on two different occasions, at least, both during the suc-

ceeding regular term, moved by counsel for the postponements that were then directed by the court; thus showing his active participation in the very proceedings he now complains of. The bills of exceptions were regularly allowed. They are properly in the record, and it is our duty to consider them. The following cases discuss the mode of procedure, and the duties and powers of the courts, relative to the preparation of bills of exceptions, and the granting of time for that purpose, showing the necessity for the establishment of the rules referred to, and the existence of the practice as we now announce it; Ex parte Bradstreet, 4 Pet. 102; U. S. v. Breitling, 20 How. 253; Sheppard v. Wilson, 6 How. 260; Muller v. Ehlers, 91 U. S. 249; Chateaugay Ore & Iron Co., Petitioner, 128 U. S. 544, 9 Sup. Ct. 150; Bank v. Eldred, 143 U. S. 293, 12 Sup. Ct. 450.

The defendant below requested the court to instruct the jury as follows, viz.:

"The court instructs the jury that by the contract of February 9, 1893, the plaintiff bound himself to deliver 10,000,000 feet, or more, of the timber specified in the contract each year, and at the points of final delivery specified therein, and that this provision of the contract could not be satisfied by the delivery at said points of less than 10,000,000 feet of timber each year; giving allowance for any slight and unimportant deficiency. If, therefore, the jury believe from the evidence in the case that the plaintiff could not have delivered 10,000,000 feet of the timber contracted to be delivered at the points of final delivery, as set out in said contract, by the 9th of February, 1893, giving allowance for any slight and unimportant deficiencies, or if the jury believe that he could not have delivered, at the said points of final delivery, 10,000,000 feet of said logs each and every year for five years, beginning with February 9, 1893, and giving allowance for any slight and unimportant deficiencies, then they must find for the defendant."

The court refused the instruction as asked for, but changed it in several particulars, and then gave it to the jury as the proper construction of the contract in controversy as to the matters therein referred to. The defendant excepted to such action of the court, both in refusing to give said instruction as it was propounded, and in giving it as changed and modified. The true construction of the contract, in the vital particulars suggested by these instructions, when considered in connection with the testimony as given to the jury, should have ended this cause, and most likely would have done so, if the court below had then found the contract to be as we now announce it. The instruction given by the court, over the objection of the defendant, reads as follows, the changes being in italics, viz.:

"The court instructs the jury that, by the contract of February 9, 1893, the plaintiff bound himself to deliver ten million feet, or more, of the timber specified in the contract each year, and at the points of final delivery specified therein, *with such agencies as he could command, considering tides,* and that this provision of the contract could not be satisfied by the delivery at said points of less than 10,000,000 feet of timber each year, giving allowance for any slight and unimportant deficiency. If, therefore, the jury believe, from the evidence in the cause, that the plaintiff could not, *with the agencies aforesaid, considering tides,* have delivered 10,000,000 feet of the timber contracted to be delivered at the points of final delivery, as set out in said contract, *by the end of the June season,* 1894, giving allowance for any slight and

unimportant deficiencies, or if they believe that he could not, *with the agencies aforesaid, considering tides*, have delivered at the said points of final delivery 10,000,000 feet of said logs each and every year for five years, *ending with the June season of each year*, and giving allowance for any slight and unimportant deficiency, then they must find for the defendant."

The court will deal with the contract as it is written. It is not ambiguous, and there is no intimation of mistake or fraud relative to its execution. All the parties to it were experienced lumbermen, and were well acquainted with the country where the timber was located, and the places where it was to be delivered. They knew the streams, the seasons, the waterfall, the tides, and they were familiar with the agencies required to take the timber from the head waters of the creeks to the localities in the river mentioned in the contract as the points of delivery. They knew what quantity of timber, on the average, could be floated out in a year, or, if the season was unusually dry, and they were unable to deliver the complement for that period, their experience and judgment were such that by their contracts they were able to provide that the delivery and gain of the season following would compensate for the failure of the other. At least, they were capable men, competent, under the law, to make such a contract, and able to bind themselves by the terms and conditions of the same. The defendant, requiring 60,000,000 feet of timber a year, contracted with the plaintiff for at least 10,000,000 feet of the same annually. Ordinary business caution would require it to provide the necessary raw material—and such the logs furnished by the plaintiff were— for its mills. The plaintiff, aware of this, and fully advised as to the necessities of the defendant, agreed to provide at least 10,- 000,000 feet of the timber it required each year; reserving the right to furnish as much more during such period as he might wish, not exceeding the total amount contracted for. By the contract in suit, Chapman obligated himself to deliver, in Russell fork of Sandy river, at the mouth of Elkhorn creek, and in the Levisa fork of said river, at the mouth of Dismal creek, 50,000,000 feet of timber, of which 10,000,000 feet, or more, was to be delivered at said points every year; the first contract year to end with the June season of 1894. Under this contract, the entire 50,- 000,000 feet might have been delivered within said first contract year, and at least 10,000,000 feet was required to be delivered within that time. The period required to execute the contract was uncertain, but within certain limits,—that is to say, as early as the end of the June season of 1894, or by the end of the June season of 1895, or the end of any such season thereafter, and not later than the one in the year 1898. The contract is dated February 9, 1893, and calls for at least 10,000,000 feet annually, and the period required to execute it would have terminated, at the latest, in February, 1898, if the parties themselves, in another section of their agreement, had not provided that the yearly settlements should occur after the June season of each year.

The argument made that Chapman would have displayed but

little business foresight—would, in fact, have signed himself an incompetent—had he contracted to deliver at least 10,000,000 feet of timber yearly, without floods and tides to do it with, has no weight, in the face of the terms of the contract itself, and we do not see that we would be justified in reading into it words which change its meaning entirely, making, in fact, a new contract for the parties thereto. If Chapman could wait for agencies not mentioned in the contract,—for flood seasons and tides,—in the meanwhile delivering no timber, and yet annually requiring the defendant to pay him large sums of money, he might be able to collect the entire amount due for the 50,000,000 feet, and yet have never in fact delivered a foot of it. If Chapman be an incompetent in the case first cited, what would the defendant be in the one now presented? And yet it is well to remember that this trouble does not occur in the contract as it was written, and that it is caused only by the words added to it for purposes of construction.

It follows, from what we have said, that the instruction, as asked for by the defendant, was properly refused by the court, because it erroneously ended the contract year, as created by the contract, on the 9th day of February of each year, instead of with the June season thereof; and, also, that the instruction, as given by the court, was, for the reasons we have set forth, improper.

In connection with the construction of this contract, and the rights and duties of the parties thereto thereunder, we think it best to say, in view of the likely retrial of this case to a jury, that the defendant's special plea, in the following words: "And the defendant, for further plea, says the plaintiff his action ought not to have and maintain, because he says that the defendant is yet in the performance of the said agreement, under and by virtue of its express terms, and that plaintiff has abandoned the same of his own wrong, and through no fault of the defendant, and defendant cannot and ought not to be required to answer the complaint, for the said alleged breaches of the said contract in the declaration mentioned, until said agreement has fully terminated; and this he is ready to verify. Wherefore, etc.,"—which was rejected by the court, was properly tendered and should have been filed. The defense set up by this plea is not simply the "general issue," but it alleges, in substance, that the defendant, under the terms of the contract, is still in the performance of the same. It sets up affirmative action by the defendant, in that, it seeing that the plaintiff, of his own wrong, had abandoned the contract, took the action provided for in the agreement, and undertook to comply with the terms and conditions of the same, in which it was still engaged. The plaintiff was entitled to notice of such a defense if it was to be relied on, and this in no wise conflicts with the rule cited by the defendant in error, and stated in the case of Insurance Co. v. Buck, 88 Va. 517, 13 S. E. 973; 4 Minor, Inst. (2d Ed.) pt. 1, §§ 692–695. It is true that, under the plea of non assumpsit, with very few exceptions, any matter of defense whatever may be given in evidence in an action of assumpsit, which tends to deny the defendant's liability to the plaintiff's demand. This plea does

not deny liability under the contract, but claims that no action can be maintained on it, for certain reasons stated, until the terms of the agreement have been carried out. It is not for us now to say whether the evidence offered sustained this plea; that was for the jury, which should have been permitted to pass upon it. If the matters alleged in said plea were true, then it followed that the plaintiff was barred for the time being from prosecuting the defendant relative thereto, and the verdict should, under the circumstances, have been for it.

The court below, at the instance of the plaintiff, gave to the jury the following instructions as the law of the case concerning the matter of the measure of damages:

"The court instructs the jury that the general rule for the measure of damages, in such cases as this, is the difference between the costs of doing the work contracted for and what the plaintiff was, under the contract, to receive for it, making a reasonable deduction for the less time engaged, and release from care, trouble, risk, and responsibility attending the full execution of the contract; and, in order to apply this rule in this case, the jury will, if they believe from the evidence that the plaintiff is entitled to recover, as set forth in instruction No. 1, proceed as follows, viz.: First. They will deduct from the fifty million feet the aggregate amount of logs which had been delivered on the pits at the creek banks on September 7, 1893, and upon this balance they will allow the plaintiff the contract prices for delivery on the pits at the banks of the stream, less what it would have cost him to cut and deliver such balance to the pits at said creek banks, and less the reasonable value of so much standing timber as would have been necessary to make such balance of fifty million feet of logs; and, in doing this, the jury will estimate the value of said standing timber at the date of the last vital breach of said contract committed by defendant, and will allow $7 per thousand feet for so many of said logs as they may believe from the evidence would be first class under said contract, and $6 per thousand feet for so many of said logs as they may believe from the evidence would be second class under the said contract. Second. They will also allow the plaintiff, on the whole fifty million feet of logs, with the exception of the 308 logs delivered at the mill before September 7, 1893, the difference between the contract prices for final delivery, and for the delivery on the pits at the banks of the streams, to wit, $2.50 for No. 1 logs, and $1 on No. 2 logs, less what it would have cost him to float said logs down the streams from the said creek banks' to the mouth of Elkhorn and Dismal, respectively; and, if the cost should be greater than $2.50 on No. 1 logs and $1 on No. 2 logs, they will deduct such excess from the amount allowed for delivery on banks of the streams. Third. They will then add up these allowances, and, from the aggregate amount allowed plaintiff, they will make the following deductions: (a) The amounts, if any, which they may believe from the evidence the logs would be damaged by being left over in the creeks above the mouth of Elkhorn and Dismal, respectively, beyond the June season of each year. (b) A reasonable sum for the less time the plaintiff was engaged in the work, and for the release to him from care, trouble, risk, and responsibility attending a full execution of the contract. And, after making these deductions, they will find the balance for the plaintiff, not to exceed, however, the sum of $100,000.00."

The court erred when it gave this instruction. It is not the law applicable to the contract and facts submitted to the jury. We will dispose of the matter by saying that if the defendant was liable in damages to the plaintiff for breaches of the contract mentioned, the measure of the same should have been found by the rule having relevancy to the violation of a contract for the sale and delivery of personal property. In the instruction to the jury,

that rule was confused with the one resorted to for the purpose of ascertaining the damages following the breach of a contract to furnish the materials and do work. We have fully considered the cases cited by counsel for defendant in error, and especially Masterton v. Mayor, etc., 7 Hill, 61; U. S. v. Speed, 8 Wall. 77; Railroad Co. v. Howard, 13 How. 307; U. S. v. Behan, 110 U. S. 338, 4 Sup. Ct. 81. The rule laid down in said cases, that upon the breach of an executory contract for work, labor, and materials, the injured party has an immediate right of action, and may recover full damages upon the whole contract, without waiting for the lapse of the full time required for the entire performance, and without tendering further performance on his part from time to time, is not questioned, nor is it germane to the case we now consider. In the Masterton Case, which is a leading one in this branch of the law, especially upon the subject of the profits that may be allowed as damages, the plaintiff contracted with defendant to furnish, cut, fit, and deliver marble, dressed in a certain manner, to be used in the construction of a building; the defendant agreeing to pay in installments. The suit involved an investigation concerning the cost to which the contractor might have been subjected had the contract been carried out, including the procuring of rough material, dressing the same, etc. Part of the marble was duly delivered and paid for, and then the defendant refused to receive and pay for any more; that being the breach complained of. Under such circumstances, the rule for ascertaining damages, embraced in the instruction given in this case, was applicable. There the marble furnished and cut under the contract had no special value for any other purpose,—in other words, there was no market for it,—and the contractor was, as to it, entitled to his contract price, and as to that not delivered he was entitled to such profit, if any, as was the difference between the contract price and the cost of procuring and preparing it ready for use. That case lacked entirely the element of market value. The other three cases named were suits on contracts for work and labor to be performed and materials to be furnished for the same. In all of them the supreme court said, in substance, that the measure of damages, under such circumstances, was the difference between the cost of doing the work and what the contracting party was to receive for it. In these cases—contracts for labor and special work—the plaintiffs were, in case of a breach of the same, entirely helpless, for their time had been occupied, their means expended, and they had neither product nor a market in which to sell it, by means of which they could have obtained the compensation they were entitled to under their respective agreements. They are entirely dissimilar to the case now under consideration, which, ex necessitate rei, requires a different rule; and the reasons for the same are so clearly stated in the opinions of the court referred to that it is not apparent to us why they are cited and so earnestly relied on by counsel for defendant in error. If a plaintiff has made the article contracted for according to a certain measure, or by a particular pattern, then the weight of au-

thority and the best reason concur that, when such an article has been completed and tendered, such plaintiff would, in case of refusal to accept, be entitled to recover the contract price. The reason is obvious, for in such a case there would be no certain market value for such an article; and the maker, having done all that he was required to do by the contract, should have its full weight. The contract in this cause was for the sale and delivery of personal property,—50,000,000 feet of timber,—and the plaintiff claimed that the defendant was guilty of breaches of said contract, in failing to comply with the stipulations thereof, and in refusing to receive said timber. If the plaintiff was entitled to recover, evidently the damages due him should not have been ascertained by the rule set forth in the instruction so given. We have no hesitancy, on the pleadings as they now stand, in announcing the true measure of damages in this case,—if damages there were,—as the difference between the contract price of the timber and its market value at the places where it was to have been delivered; and if the defendant below had entire control of the market at those places, as is claimed by defendant in error, then the measure of damages was the difference between the contract price of the timber at such points and the price of like timber in the nearest available market, less the additional cost of delivering such timber from said points to such nearest market. McNaughter v. Cassally, 4 McLean, 530, Fed. Cas. No. 8,911; Pope v. Filley, 9 Fed. 65; Tower Co. v. Phillips, 23 Wall. 471.

It was the spirit of this rule, and the reasons given by the courts for establishing it, that prompted the announcement of another now well-established principle in cases like this,—that where a party is entitled to the benefit of a contract, and can save himself from a loss arising from a breach of it at a trifling expense, or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent. Wicker v. Hoppock, 6 Wall. 94; Miller v. Mariner's Church, 7 Me. 51; Russell v. Butterfield, 21 Wend. 300; U. S. v. Burnham, 1 Mason, 57, Fed. Cas. No. 14,690; Taylor v. Read, 4 Paige, 561; Warren v. Stoddart, 105 U. S. 224. And, also, if the plaintiff has sustained no damage by the breach of the contract of the defendant, he has no right of action; and unless it appears that property prepared for delivery under the contract could not be sold to other parties for prices as remunerative as the contract called for, plaintiff cannot recover. Barnard v. Conger, 6 McLean, 497, Fed. Cas. No. 1,001; Parish v. U. S., 8 Wall. 489.

Without expressing an opinion upon other questions discussed by counsel, and which may not arise upon another trial, the judgment is reversed, and the case remanded, with directions to set aside the verdict and grant a new trial, and for such further proceedings as may be consistent with this opinion.