10281

CLINTON OIL & MFG. CO. v. CARPENTER.

(101 S. E. 47.)

1.  SALES—JURY QUESTION; BUYER'S NOTICE TO SELLER TO SHIP.—In buyer's action for seller's refusal to deliver balance of goods under contract to sell certain amount during certain period, question of whether buyer had ordered shipment of balance of goods in time for shipment before expiration of period *held* for jury.

2.  SALES—JURY QUESTION; WAIVER OF TERMS OF CONTRACT.—In buyer's action for seller's nondelivery of balance of goods under contract to sell certain amount during certain period, question of whether seller waived his right to have buyer's orders for shipment in time to ship goods before expiration of period *held* for jury.

3.  SALES—TENDER AFTER REPUDIATION BY OTHER PARTY.—When one party to a contract notifies the other party that he elects to breach the contract, other party need not make tender, since tender would be an idle performance.

4. SALES—NONDELIVERY; BUYER'S DAMAGES.—Buyer's damages for seller's failure to deliver were measured by market value of goods at time and place of delivery, or, if not ascertainabble at place of delivery, at nearest market place, plus cost of shipment to place of delivery, if any.

5. SALES—PROSPECTIVE PROFITS; ACTION FOR NONDELIVERY.—In buyer's action for nondelivery, buyer's ability to have made profit or to suffer loss by resale to others was immaterial; being *res inter alios acta*.

Before MAULDIN, J., Spartanburg, Fall term, 1918. Affirmed.

Action by the Clinton Oil & Manufacturing Company against J. H. Carpenter. Judgment for plaintiff, and defendant appeals.

Following is the statement of the five questions argued by appellant and referred to in opinion:

Five questions are raised by the appeal:

(1) Was there any testimony that the plaintiff notified the defendant and gave shipping instructions for the shipment of acid phosphate within the period contemplated by the contract and custom of the trade before the expiration of same?

(2) Did the defendant waive his right to receive cash on or before May 1, 1917, for the fertilizer sold, that of necessity he would had to have manufactured on that date if he had filled the belated order?

(3) Did the presiding Judge err in submitting the question of waiver to the jury, there being no evidence of such?

(4) Was it incumbent upon the plaintiff to make a demand for a delivery of the acid phosphate within the period named as contemplated by the parties to the contract and customs, and to tender the purchase price before he could maintain this action?

(5) Was so much of the charge as is excepted to in eleventh exception a charge on the facts and an improper element of damage?

*Messrs. Pitts & McConnico, George W. Nichols, John Gary Evans* and *L. A. Phifer,* for appellant. *Messrs. Pitts & McConnico, John Gary Evans* and *L. A. Phifer* submit: *Was there any testimony that the plaintiff notified the defendant and gave shipping instructions for the shipment of acid phosphate within the period contemplated by the contract and custom of trade?* 98 S. C. 282; 5 S. C. 465; 45 S. C. 186; 47 S. C. 373; 84 S. C. 363; 53 S. C. 46; 44 S. C. 81; 57 S. C. 142; 27 S. C. 134; 95 S. C. 229. *Was it the duty of the defendant to have waived his right to deliver before May 1st and collect on May 1st his money for goods sold, and have made shipment regardless of the delict on part of plaintiff?* 90 S. C. 490; 71 W. Va. 148; 143 Iowa 117; 32 L. R. A., p. 1, and essential annotations thereto; 2 L. R. A. (N. S.) 529. *Did the presiding Judge err in submitting the question of waiver to the jury?* 40 Cyc., p. 263, and notes 22 and 23; Am. & Eng. Enc. (2d Ed.), vol. XXIX, p. 1106, and notes; 83 S. C. 262; 90 S. C. 135; 88 S. C. 223; 72 S. C. 355; 81 S. C. 541; 91 S. C. 17. *Should plaintiff have tendered the purchase price during the continuance of the contract or afterwards as a prerequisite to bringing the suit?* 89 S. C. 279.

*Messrs. Bomar & Osborne* and *Lyles, Daniel & Drummond,* for respondent, cite: *As to measure of damages:* 35 Cyc. 638; 23 Wall. 47; 23 L. Ed. 71; 47 S. E. 823 (Va.); 57 L. R. A., p. 197; 84 S. C. 249; 84 A. C. 358; 90 S. C. 79.

October 14, 1919.

The opinion of the Court was delivered by MR. JUSTICE GAGE.

Action for damages for breach of a contract; verdict for the plaintiff; appeal by the defendant.

The appellant has argued five questions; let the statement of them be reported as set down on the fourth and fifth pages of the brief.

There is no question about the existence of the contract. Omitting the irrelevant parts of it, the contract is in these words:

"J. H. Carpenter *agrees that he will sell* to the other parties to this contract * * * acid phosphate during the two seasons, May 1st, 1916, to May 1st, 1917, and May 1st, 1917, to May 1st, 1918, at the price of $8.50 cents per ton f. o. b. cars at the plant of Carolina Phos. Co. near Greenville, the fertilizer to be paid for on May 1st, 1917, and May 1st, 1818, respectively."

The italics are supplied.

The persons to the whole transaction are the Tennessee Fertilizer Company at Nashville, Tenn., represented by Carpenter, its president, resident then in New York; Sparrow, its secretary, resident at Nashville; Todd, the local agent and manager of the Carolina Phosphate Company, a domestic corporation at Greenville and an agency of the Tennessee corporation; Bryson, the head of two domestic corporations, the Woodruff Oil & Fertilizer Company at Woodruff, in Spartanburg, and the Clinton Oil & Manufacturing Company, at Clinton, in Laurens.

The instant transaction is for the fiscal year first named, May 1, 1916, to May 1, 1917; and the amount of acid phosphate thereby agreed to be sold to the plaintiff was 1,000 tons.

There is likewise no question but that only 160 tons of acid phosphate was delivered under the contract, and that the defendant refused to deliver the balance of 840 tons.

The alleged wrong of such refusal is the plaintiff's cause of action.

We now come to the appellant's first question. The contention of it is that there was no testimony that the plaintiff vendee notified the defendant vendor, and gave to the vendor shipping instructions for the shipment of all the 1,000 tons

of acid phosphate within the period contemplated by the contract and by the custom of trade, before the expiration of the time for shipment.

This exception requires some particular examination of the testimony.

Reverting to the contract, it may be fairly inferred from the words of it that the acid phosphate was to be delivered to the plaintiff before the 1st day of May, for that was the end of the fiscal year, and payment of the price was then due.

If, therefore, the plaintiff did not call for an execution of the contract by asking for a delivery to it before 1st May of the 1,000 tons, manifestly the defendant has done the plaintiff no wrong.

The contract does not prescribe by what formality, in time or in agency, the vendee should call for delivery of the acid; it does not prescribe that the call for delivery shall be intermittent, or that it shall be in writing; indeed, the appellant does not contend for so much.

A witness for the vendor described this as the method of calling for a delivery:

"I am familiar with the customs of the trade as to quantities of this product usually ordered out at one time to be shipped during the season. It is the custom of the trade in carrying out a contract of this kind to ship from time to time during the season, and not all in bulk at one time. The custom is to give orders from time to time during the season and directions for shipment and to whom it is to go. Sellers cannot make shipments without shipping instructions. We must wait until such instructions are received before shipping; it would be impossible to ship without these instructions."

It is conceded that the vendee made six calls, and the vendor made six deliveries for the vendee, starting 18th January and ending 2d February, aggregating 160 tons, and all shipped to Woodruff.

The present contention of the vendor is that the vendee on 1st February wrote the vendor not to make any further shipments until "we write you again;" and that the vendee did not after that date make any further call for shipment until 30th April, on which day the vendee directed the vendor by telegraph "if *compelled to have shipping instructions* ship balance Woodruff Clinton acid to Spartanburg." The italics are supplied.          ·

And the vendor's consequent contention is that this instruction, though within the letter of the contract, came too late for him to comply with the contract, and it was, therefore, inoperative.

Assuming that circumstance to be a valid exuse, yet the testimony tends to prove that on the 19th March the Tennessee Fertilizer Company wrote to the plaintiff and acquired specifically of it to ascertain "the total amount of acid phosphate which you will take during the current season ending May 1, 1917."

Thereto the plaintiff answered on 21st March that it "expected to take the amount the contract calls for."

It is true Todd testified that he could not say that he was advised of that correspondence.

There was, nevertheless, no warrant for the defendant with the plaintiff's letter of 21st March before him to have been misled by the plaintiff's aforementioned letter of 1st February.

The testimony also tends to show that the plaintiff, independently of the telegram of 30th April and before that date, frequently requested the defendant, in person and by the agency of a phone message, to ship out the balance of the contract. Mr. Bryson so directly testified more than once. It is true that Mr. Todd testified that he never recognized verbal orders coming to him over the phone; but he admitted that he suspended shipments upon request by phone to do so, and he also admitted that he had first received by phone

the substance of the telegram of 30th April which explains the italicized words of that telegram.

This testimony made for the jury a pointed issue, whether or not the plaintiff eight or ten days before the 1st May (admitted by Todd to be sufficient period in which to execute an order) ordered to be shipped the balance of the contract.

This conclusion makes irrelevant the inquiry whether the defendant chose not to stand on his right to have in hand before 1st May orders to ship out.

But the second and third grounds of the appellant make that issue, and we shall decide it also.

Of course, the vendor may have waived his right to stand on the letter of the contract; no practice is more common amongst men.

There is abundant testimony tending to prove that the defendant was not minded to exact that all the orders for shipment should be in before 1st May, and that shipments out should inevitably take place before that day.

In this connection, it is not worth while to inquire if Todd had the power to make such a waiver a consideration strongly pressed by the appellant; the waiver, if there was such, was made by the principal in interest.

On May 5th, Bryson wrote to the Tennessee Company and inquired "in regard to the balance of acid on Woodruff Oil & Fer. Co. and Clinton Oil & Mfg. Co.'s contracts with the Carolina Phos. Co. I will be glad to know what the carrying charges will be on it until I can get it out." Thereto the Tennessee Company answered:

"We have your favor of the 5th instant, in reference to carrying the balance of your acid phosphate contract. Owing to some delays in shipment of the goods, we consented to extend the time for delivery thirty days, and to ship the acid phosphate which was ordered during the month of May. We cannot hold the goods longer than this, and will be glad to have your orders as soon as possible."

The defendant executed the orders of the Woodruff Company in May; and Todd testified that "everybody got it carried over but the Clinton Company," and that Bryson frequently phoned him about slow shipments. And Todd knew, for he had been president of the Clinton Company, that the Woodruff Company and the Clinton Company were practically one, represented in the person of Bryson; and that the acid for both corporations had been delivered at Woodruff.

The real reason assigned by the Tennessee Company who, it chose to execute in May the orders of the Woodruff Company and chose not to execute those of the Clinton Company appeared for the first time in the Tennessee Company's letter to Bryson dated May 24th; here is what Sparrow then wrote to Bryson:

"According to our records, there is a balance of 325 tons acid phosphate on the contract of the Woodruff Oil & Fertilizer Co., and we will ship this in accordance with our letter of May 16th. We made this agreement purely as a matter of accommodation, since the time for delivery had already expired, and, as the Woodruff Oil & Fertinizer Company had taken the larger part of their contract, we were willing to make this arrangement.

"With reference to the Clinton Oil & Manufacturing Company we beg to say that the latter company failed to take the goods according to the contract, and for that reason we cannot recognize any obligation to furnish the acid phosphate.

The same was repeated by letters on June 30th and August 10th. But before that, on the 8th of May, as before stated, the Tennessee Company had seemed to grant the extension to Bryson. Under these circumstances, it was a question for the jury to find if the defendant had foregone its right to a literal enforcement of the contract.

2—S. C. 113

This fetches us to the appellant's fourth ground, which is that the plaintiff was obliged to have tendered the price of the acid before action for a breach of contract would lie.

But tender looks to the performance of a contract, and is made to secure performance. Of course, when one party to a contract notifies the other party to it that he elects to breach the contract, then tender would be an idle performance, and the law does not exact such like. 13 Corpus Juris, p. 662, sec. 747; 6 R. C. L., p. 948, sec. 328.

The fifth ground refers to the measure of the plaintiff's damages.

The Court allowed the plaintiff's fifteenth request thereabout in these words:

"If you find for plaintiff, your verdict will include the difference between the contract price and the market price of acid at the time and place of delivery upon each ton that was not delivered, plus the freight from the nearest market to Greenville, which, under the undisputed evidence, is $2.75 per ton, and it likewise is proven that the market price at said time was $12.50 per ton on May 1st."

It is plain that by the contract the plaintiff was entitled to have at Greenville 840 tons of acid for the price of $8.50 per ton; it is plain, too, that the defendant breached the contract by a failure to deliver the acid.

There were two methods to make the plaintiff whole: (1) A delivery to it at Greenville of 840 tons of acid for $8.50; or (2) the payment to it of the then value (May 1, 1918) of the acid at Greenville; and (3) if there was no ascertainable value of the acid at Greenville, then such value at the market place nearest to Greenville. And as the contract called for a delivery at Greenville, if it cost money to so deliver the acid, the defendant had to pay it. DesChamps' case, 84 S. C. 358, 66 S. E. 414.

The cost of such delivery was merely incidental to the main undertaking. It is, therefore, irrelevant to say that

the plaintiff never paid freight from Atlanta.  *Grand Tower Co. v. Phillips,* 23 Wall. 478, 23 L. Ed. 71, and other cases cited by the respondent.

So two transactions between the plaintiff and Keaton and others, whereby the plaintiff contracted to sell and did sell the 840 tons to third persons, has no relevancy to the contractual relation which existed between the plaintiff and the defendant.

The ability of the plaintiff by a resale to others to make a profit or to suffer a loss had nothing to do with the contract in issue; it was *res inter alios acta.*

If the price of acid had fallen below $8.50, instead of rising above it, the plaintiff would have been liable to pay the defendant $8.50; and that without reference to any transaction betwixt the plaintiff and the third persons named. The case is not altered as it is here presented.

The judgment is affirmed.

MESSRS. JUSTICES HYDRICK and WATTS concur.

The CHIEF JUSTICE and MR. JUSTICE FRASER did not sit.