## TORONTO, HAMILTON & BUFFALO NAV. CO. v. UNITED STATES.

### No. 46435.

United States Court of Claims.
Dec. 6, 1948.

238

Frank J. Mahony, of New York City (Frederick L. Wheeler and C. Austin White, both of New York City, on the brief), for plaintiff.

Kendall M. Barnes, of Washington, D. C., and H. G. Morison, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and HOWELL, WHITAKER, LITTLETON and MADDEN, Judges.

HOWELL, Judge.

This is an action to recover just compensation, pursuant to the Fifth Amendment to the Constitution, for the Great Lakes car ferry Maitland No. 1, requisitioned by the War Shipping Administration of the United States on August 20, 1942.

The only question presented in this case relates to the value of the Maitland No. 1. Plaintiff contends that its value is somewhere between a minimum of $332,500 and a maximum of $458,689.89, while it is the defendant's position that the value does not exceed $72,500. The Commissioner of the Court reported a value of $182,900. The difference between the various figures results entirely from differences in the elements considered in computing the value of the vessel and the weight to be given to those various elements.

This vessel was requisitioned pursuant to Section 902 of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1242. Subdivisions (a) and (d) of this section, which are the only ones here pertinent, read as follows:

"(a) Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for

WHITAKER and MADDEN, Judges, dissenting.

the Commission to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property. The termination of any emergency so declared shall be announced by a further proclamation by the President. When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use. If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, such property shall be restored to the owner in a condition at least as good as when taken, less ordinary wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the property in such condition. The owner shall not be paid for any consequential damages arising from a taking or use of property under authority of this section.

*    *    *    *    *    *

"(d) In all cases, the just compensation authorized by this section shall be determined and paid by the Commission as soon as practicable, but if the amount of just compensation determined by the Commission is unsatisfactory to the person entitled thereto, such person shall be paid 75 per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum will make up such amount as will be just compensation therefor, in the manner provided for by section 24, paragraph 20, and section 145 of the Judicial Code (U.S.C.1934 edition, title 28, secs. 41, 250)."

The Maitland No. 1 was designed and built by the Great Lakes Engineering Works in 1916. It was a conventional, steel hull, two masted, two stacker, twin screw, car ferry with extra weight of steel to make it suitable for winter icebreaking operation. The vessel was 350 feet in length, 56 feet beam, 20 feet 6 inches molded depth to the car deck, with a clearance between the car and the spar decks of 17 feet 7 inches. Its gross tonnage was 2,757 tons and it was powered by two triple expansion reciprocating engines driven by four Scotch boilers, fired by coal under a forced draft to operate at a maximum pressure of 175 pounds. The hold was divided into eight compartments housing the engines, boilers, steering engine, coal bunkers, ballast and shaft alley. The coal bunkers had a capacity of 332 net tons. Four railroad tracks were installed on the car deck and they had a capacity of 30 box cars of the short conventional size weighing loaded, 70 tons, or 26 cars of the larger, modern type.

The Maitland No. 1 was constructed for Mr. L. N. Beckley, who was the president of plaintiff. The approximate cost of constructing the vessel was $362,800. In August 1916 the plaintiff acquired the Maitland No. 1 from Mr. Beckley at a cost of $394,560, a mark-up of about 8.75 percent over cost of construction.

From 1917 to 1930 plaintiff expended $38,115.46 for equipment and betterments to the vessel.

From October 1916 to June 1932, plaintiff operated the Maitland No. 1 on Lake Erie, between the ports of Ashtabula, Ohio, and Port Maitland, Canada, a distance of 91 miles. The vessel was capable of making three round trips every two days, and carried commodities loaded in freight cars moving between points in the Pittsburgh area, served by the New York Central Railroad, and points in Canada, served by the Toronto, Hamilton and Buffalo Railway Company. From the date of its organization to about February 10, 1936, all of plaintiff's capital stock was owned by the latter company, a subsidiary of the New York Central Railroad. On or about the latter date, the Toronto, Hamilton and Buffalo Railway Company distributed plaintiff's stock to its stockholders, the New York Central and the Canadian Pacific.

The Maitland No. 1 was the only vessel owned and operated by plaintiff on its car ferry line. Plaintiff's chief source of revenue was derived from the transportation

of bituminous coal to Canada, and its annual income over the sixteen and one-half year period of operation fluctuated with the tonnage of coal carried by the car ferry. For the first four and one-half years (August 12, 1916, to January 1, 1921), the average annual net operating income from the Maitland No. 1 was $17,216.28. In 1921 and 1922 the car ferry was operated at a net loss, the average loss for the two years being $14,461.90. During the next five years (1923 to 1927, inclusive), the net operating income from the Maitland No. 1 was at its highest level during the entire period the car ferry was in use, averaging $129,893.92 per annum. Beginning in 1928, the net operating income declined sharply below the 1927 earnings. This downward trend continued in 1929, the average net income for the two years being $22,950.42. The vessel was operated at a net loss in 1930, 1931 and the first six months of 1932, the average annual loss being $15,417.82. For the entire period from August 12, 1916, to June 30, 1932, plaintiff's annual average net income from the Maitland No. 1, before Federal income taxes, was $42,816.36. This amounted to 10.41 percent of plaintiff's investment.

The sharp decline in plaintiff's net operating income in 1928 and 1929 was contrary to the trend of earnings of Class I railroads in this country during the same period. In 1928 and 1929 the freight revenues of Class I railroads of the United States were in excess of their 1927 revenues. Also, the exports of bituminous coal from the Ohio Customs District to Canada were greater in 1928 and 1929 than in 1927.

The reasons for this reduction in revenue, which began in 1928 and ultimately resulted in the discontinuance of operations in 1932, were set out in an application which plaintiff filed with the Interstate Commerce Commission on February 11, 1943, for leave to abandon its car ferry line. This application was filed after the defendant had requisitioned the Maitland No. 1, and the first reason stated for abandonment was that the only vessel owned by plaintiff had been requisitioned by the War Shipping Administration. The second ground for abandonment, as stated by plaintiff in this petition, was: Since June

1932, when the vessel operation ceased there has been insufficient traffic available to justify the operation. Cross-lake traffic to Canadian rail heads dropped off upon the opening of the new Welland Canal in 1932 because larger vessels could take cargoes directly from Lake Erie to Lake Ontario ports. Traffic handled over the route moves on a slower schedule than if handled all-rail through Buffalo, New York. Identical rates are applicable over the two routes.

In its Reply to Questionnaire filed with the Interstate Commerce Commission in the same proceeding, plaintiff expanded on this matter, stating:

15A. The traffic over the line decreased to such an extent that service was suspended on June 28, 1932. Prior to 1928 the bulk of the traffic handled consisted of bituminous coal for movement to the Steel Company of Canada at Hamilton, Ontario. In August 1928, this traffic was diverted to Sodus Point, New York, for movement across Lake Ontario to Hamilton. When the new Welland Canal was opened in August 1932, most of the remaining traffic was lost since vessels formerly unable to navigate the old Canal were enabled to take shipments directly to Lake Ontario points, by-passing Port Maitland without using the facilities of the applicant or its connecting rail line in Canada.

\*  \*  \*  \*  \*  \*

17A. No effort has been made to dispose of the line so as to insure continued operation since traffic is not available in sufficient quantities to warrant continued operation, even if a suitable car ferry were available. The all-rail routes are adequate and convenient.

As noted above, the Maitland No. 1 was laid up at her dock at Ashtabula, Ohio, on June 30, 1932. After that date it was never operated by plaintiff, and was never operated as a car ferry. On November 29, 1935, plaintiff did charter the Maitland No. 1 to Nicholson Universal Steamship Company, which covered the tracks on the car deck with planking and used the vessel to carry freight across Lake Michigan, between Milwaukee, Wisconsin, and Muskegon, Michigan. However, it was discovered that this operation was in violation of

Section 27 of the Merchant Marine Act of 1920, 46 U.S.C.A. § 883, which prohibits the transportation of merchandise by water between two ports of the United States in vessels owned by persons who are not citizens of the United States. To avoid the effect of this statute, plaintiff made an agreement with Nicholson Universal Steamship Company whereby title to the Maitland No. 1 was transferred to Nicholson on February 10, 1936, for a total consideration of $166,000. In the contract of sale plaintiff retained the right to recapture the vessel within a specified time, and exercised this right on December 15, 1937, reacquiring title for $92,-894.80.

During the succeeding period, the vessel was moored at her dock in Ashtabula, Ohio, with either the Chief Engineer or Captain on board as shipkeeper, during which time steam was maintained in the boilers, the engines were turned over periodically, maintenance work was performed, and extra help was employed when necessary. Some minor repair work was done at an average annual expenditure during the period from January 1, 1938, to August 20, 1942, of about $300.

On August 20, 1942, the War Shipping Administration requisitioned title to and possession of the Maitland No. 1. On the following day a representative of War Shipping Administration made a condition survey of the vessel and itemized the repairs that were necessary to place her in operating condition. He estimated a total expenditure of $34,980, involving principally the replacement of the furnaces which heated the boilers and the retubing of the boilers. In addition to the items listed by him, the vessel required some additional minor repairs.

Shortly after the requisition the War Shipping Administration removed the machinery from the vessel and sold the hull to a purchaser who converted it into a barge.

On April 20, 1943, the War Shipping Administration fixed the sum of $72,500 as just compensation for, and the fair value of, the Maitland No. 1. Plaintiff was given prompt notice of this determination.

On December 21, 1943, plaintiff notified the defendant that the amount fixed by it as just compensation was unsatisfactory to plaintiff, and that it elected to exercise its statutory right to receive 75 percent of the award without prejudice to its right to sue for additional compensation. On June 10, 1944, defendant paid plaintiff the sum of $54,375, being 75 percent of the War Shipping Administration's determination of just compensation.

In considering the question of the value of the Maitland No. 1, it is first essential to understand the background against which such value must be determined. The first point to consider in this connection is that, although the use to which the Maitland No. 1 was best adapted at the time of the requisition was as a car ferry on the Great Lakes, there was no demand for her for such use. The reason for this lack of demand requires a brief consideration of the entire history of car ferry operation on the Great Lakes.

Most operation of car ferries on the Great Lakes has centered on Lake Michigan and the Detroit River. The only car ferries which have ever operated elsewhere on the Great Lakes, so far as the present record discloses, are the Maitland No. 1, the Ashtabula, owned by the Pennsylvania Railroad, and the Marquette and Bessemer No. 2, jointly owned by the Marquette and Bessemer Dock and Navigation Company and the Pere Marquette Railway Company, all three of which operated across Lake Erie from Ohio to Canada. As noted above, lack of traffic and its diversion to other routes had caused plaintiff to take the Maitland No. 1 out of service in the middle of 1932. The Pennsylvania Railroad continued the operation of its car ferry, since it did not control a rail route into Canada, as did the New York Central. Neither in 1942 nor at any time subsequent thereto has the Pennsylvania Railroad required an additional car ferry to handle its traffic. The Marquette and Bessemer No. 2, referred to above, had been laid up in 1931, was not operated thereafter, and was sold in March 1942 for $37,724.04.

With the exception of car ferries operated across the Detroit River, where an

entirely different type of boat was used under different traffic conditions, the balance of the car ferries on the Great Lakes operated across Lake Michigan chiefly between points in Michigan and in Wisconsin. Until about 1930 these car ferries held a competitive advantage over the all-rail transportation of loaded freight cars moving from western points to New York and Canada. Freight cars transported on the all-rail routes had to move through the Chicago yards, where the congestion was so great that freight cars were frequently delayed for long periods of time. In addition, freight rates on the car ferry lines were lower than on the all-rail routes. Some time between 1928 and 1930 the railroads completed the construction of the "outer belt" railroad around the city of Chicago, and thus enabled through freight shipments to avoid the delays previously experienced in the Chicago yards. About the same time the rate differential in favor of the car ferry lines was abolished. There were also changes in the nature of the traffic carried by the car ferry lines, which required greater clearance between the car decks and the cabin decks of the vessels to permit open-type freight cars to be loaded with maximum loads.

As a result of these changed conditions, the car ferry lines were no longer able to compete successfully with the all-rail routes, at least so long as they were operating vessels of the type of the Maitland No. 1. For that reason, this type of vessel became obsolete for further use as car ferries on the Great Lakes. By 1932 the majority of these outmoded car ferries had been laid up and were replaced by larger vessels, having greater speed to permit faster and more regular operation (including operation on a twelve months' basis, as contrasted with the winter layup which the Maitland No. 1 had always had), and provided with more clearance between the decks so as to accommodate larger loads. The new vessels were also capable of carrying a larger number of freight cars, and had additional facilities for carrying passengers (and, if space were available, their automobiles), in order to. provide a new source of revenue for the operators.

Between 1936 and 1940, several car ferries resembling the Maitland No. 1 were sold to purchasers who converted them to highway ferries.

In 1938, the Pere Marquette Railway Company sold the car ferry, Pere Marquette No. 20, which had been built in 1903 from the same plans as the Maitland No. 1, to the Michigan Highway Department. The sale price was $50,000, plus an additional $10,000 for delivering the vessel across Lake Michigan to a shipyard.

In 1940 the Pere Marquette Railway Company sold the car ferry, Pere Marquette No. 17, which had been built in 1901 to the same plans as the Maitland No. 1, to the Michigan Highway Department for $65,000.

Although the Pere Marquette Nos. 17 and 20 were comparable to the Maitland No. 1 in size, carrying capacity, speed and design, they were older vessels and on the dates they were sold, were in a much poorer state of repair than was the Maitland No. 1 on the date of the requisition.

In some instances, Great Lakes car ferries have been sold and converted to ocean-going car ferries, which operate between Texas City, Texas, and New York, between New Orleans and Havana, Cuba, and between Florida and Cuba. The cost of moving the Great Lakes vessels to the coast and altering them for use in salt water is substantial and it has not been economically feasible to use them on the long routes from Texas to New York, or between New Orleans and Cuba. For such long hauls, they cannot compete successfully with the Sea Trains which can carry about four times as many freight cars.

However, such converted vessels have proven satisfactory for car ferry service between Florida and Cuba. In 1942, there was a demand for a vessel such as the Maitland No. 1 for use as a car ferry between Florida and Cuba.

The United States in June 1942 had appropriated two ferries from the Florida East Coast Car Ferry Company, one, the Joseph R. Parrott, and the other, the Estrada Palma, for which the parties by open negotiation and agreement, without

litigation, fixed a value of $665,000 for both, or $332,500 for each.

An analysis provides a startling comparison of the equality of the vessels in type, construction, machinery and condition.

car ferries were sold to purchasers, who removed the engines from the boilers, tore off the super structure of the vessels and used them as bulk carriers of pulpwood.

In July 1940, the Pere Marquette Rail-

| Vessel | Joseph R. Parrott | Estrada Palma | Maitland No. 1 |
|---|---|---|---|
| Date of survey | 5/31/1942 | 6/19–21/1942 | 8/21/1942. |
| Year built | 1916 | 1920 | 1916. |
| Gross tons | 2,406 | 2,639 | 2,757. |
| Net tons | 1,114 | 1,340 | 1,653. |
| Propelling machinery | Twin screw triple expansion. | Twin screw triple expansion. | Twin screw triple expansion. |
| Boilers | 4 Scotch forced draft. | 4 Scotch forced draft. | 4 Scotch forced draft. |
| Sale price | $332,500.00 | $332,500.00 | ? |
| Cost to place in operating condition. | $23,595.00 | $19,430.00 | $34,980.00. |
| Sound condition value | $356,095.00 | $351,930.00 | ?. |

The acquisition of the Joseph R. Parrott and the Estrada Palma provide contemporaneous transactions in vessels of great similarity to the Maitland. As a means of establishing value by the market value method, the values fixed for the Joseph R. Parrott and the Estrada Palma should furnish close equivalents.

The principal difference between the vessels was that the latter two were equipped to operate in and had been used in salt water, whereas the evidence shows that in August 1942 it would have cost approximately $115,000 to move the Maitland No. 1 to the Atlantic Coast and fit her for operation in salt water.

The normal useful life of a car ferry operated on the Great Lakes is fifty years, whereas such a car ferry operated in salt water has a normal useful life of only forty years.

Even after the normal life for its primary use as a car ferry has ended, such a vessel has a residual value for a secondary use, such as a highway ferry, bulk carrier, a marine auxiliary for a wrecker, a marine dormitory, a bulkhead, a night club, or as scrap steel.

In 1940 and 1942, two vessels which had become obsolete for further use as

way Company sold the Pere Marquette No. 19 to John Roen of Sturgeon Bay, Wisconsin, for $24,000. The vessel was built to the same plans as the Maitland No. 1 and was a sister ship of the Pere Marquette No. 20, which was referred to above. She had been laid up for a number of years, and just prior to the sale, the owners estimated that an expenditure of $308,000 would be required to recondition her for an additional fifteen or twenty years' operations.

In March 1942, the Marquette and Bessemer No. 2 was sold to the Filer Fiber Company for $37,724.04. The vessel, which had been built in 1910 from the same plans as the Maitland No. 1, was jointly owned by the Marquette and Bessemer Dock and Navigation Company and the Pere Marquette Railway Company and had formerly been used as a car ferry on Lake Erie. She had been retired from service as a car ferry in 1931 and received no maintenance or repairs thereafter. In 1936 the vessel was towed to Cleveland, where she was used during 1936 and 1937 as a cabaret in connection with the Cleveland Exposition. The operators of the night club removed her bulwark plates, tore out the cabins and stripped her of most of her

244

readily removable parts and equipment. Prior to the sale, the owners estimated that by expending $300,000 for repairs, the vessel could be placed in condition to operate for fifteen or twenty additional years.

■ The general rule is that market value at the time and place of taking is just compensation for condemned property. United States v. New River Collieries Co., 262 U.S. 341, 344, 43 S.Ct. 565, 67 L.Ed. 1014; United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; United States ex rel. and for Use of Tennessee Valley Authority v. Powelson, 319 U.S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390. Every isolated sale of property, however, does not thereby create or establish a market in such property for the purpose of ascertaining market value. If the property taken "be an article commonly traded in on a market, and it is shown that at the time and place it was taken there was a market in which like articles in volume were openly bought and sold, the prices current in such a market will be regarded as its fair market value, and likewise the measure of just compensation for its requisition". United States v. New River Collieries Co., supra, 262 U.S. at page 345, 43 S.Ct. at page 567, 67 L.Ed. 1014. "So evidence of prices current among dealers in those commodities which are the subject of frequent sales by them would also be proper to show value". Sharp v. United States, 191 U.S. 341, 349, 350, 24 S.Ct. 114, 116, 48 L.Ed. 211. The transactions relied upon however, to establish a market value should be numerous and the quantities sold should be extensive in order that a proper criteria of market price be obtained. United States v. New River Collieries Co., supra, 262 U.S. 341, at page 345, 43 S.Ct. 565, 67 L.Ed. 1014.

■ Where, as in this case, the property condemned is unique, or of a special type or character, or so peculiarly situated, that there is no evidence of proper sales by which to establish value, or, where there may be evidence of dealings in similar property, but the transactions have been few and infrequent, or they may have been of such a character, or so remote in time, that they do not meet the test of numerous sales in significant quantities as required by law, then resort must be had to other methods and other evidence to establish the value of the property taken. United States v. Miller, supra, 317 U.S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; Washington Water Power Co. v. United States, 9 Cir., 135 F.2d 541, 542.

Sometimes "the value of property, generally speaking, is determined by its productiveness,—the profits which its use brings to the owner. Various elements enter into this matter of value. * * * value, therefore, is not determined by the mere cost of construction, but more by what the completed structure brings in the way of earnings to its owner". Monongahela Navigation Co. v. United States, 148 U.S. 312, 328, 13 S.Ct. 622, 627, 37 L.Ed. 463. "Among the factors to be taken into consideration is such an amount as when capitalized at a certain percentage will produce yearly the revenue which plaintiff has lost * * *". Willow River Power Co., Inc. v. United States, 101 Ct.Cl. 222, 230.

In this case there are several unusual factors which render it difficult to apply the ordinary methods in determining a fair compensatory value at the time of the taking of the Maitland No. 1. We have found that the vessel was best adapted at the time of requisition as a car ferry on the Great Lakes, though there was no demand for her for such use. Furthermore, we have before us the fact that the Maitland No. 1 was laid up at her dock on June 30, 1932. Later the vessel was used for a short time to carry freight across Lake Michigan, which can be termed as a profitable use which might have been continued had this operation not been in violation of the Merchant Marine Act of 1920, supra. Obviously, the vessel had a value in excess of the residual value of an obsolete car ferry even though it was not in actual operation in 1942.

■ In view of all these circumstances, we are compelled to resort to a consideration of the earnings of the Maitland No. 1 during the time that the vessel was actually operated as a car ferry, in conjunction with the contemporaneous trans-

actions in vessels of close similarity in determining a fair value.

The proof in this case shows that the average annual net profit for the 16-year period that the vessel was operated, before income taxes, amounted to $42,816.36, a return on investment of 10.41 percent per annum.

The testimony further disclosed that the Maitland No. 1 had a residual value solely as scrap in 1942 of approximately $13,500, and that at the time of the trial such scrap value varied between $64,000 and $100,100. The sale prices of the several obsolete car ferries represent their residual values for secondary uses and those prices ranged between a low of $24,000 paid for the Pere Marquette No. 19, to a high of $65,000 paid for the Pere Marquette No. 17.

The average mean residual value of an obsolete car ferry can be taken at $50,000. Attributing this value to the Maitland No. 1, the capitalized value of an annual income of $42,816.36 for a period of 24 years at an annual rate of 10 percent per annum amounts to $389,767.15, according to actuarial tables in evidence.

This figure approximates the amount paid by defendant to Florida East Coast Car Ferry Company for the car ferries Joseph R. Parrott and Estrada Palma, both of which vessels had been operating along the Atlantic Coast and consequently were equipped to operate in salt water. The Maitland No. 1, however, was not equipped to operate in nor had it been used in salt water. As a matter of fact, it had been operated only in fresh water involving no great length of haul. The evidence discloses that the normal useful life of a car ferry operated in salt water is only 80 percent of such a ferry operated in fresh water, the comparison being 40 and 50 years respectively. The remaining useful life of the Maitland No. 1 operated in salt water would be reduced by 20 percent, which in turn would be reflected in its value at the time of taking. Consequently, from the value of $389,767.15 there must be deducted $77,953.43.

A survey of the Maitland No. 1 made at the time of its requisition, which defendant stipulated reflected its true condition, indicated that an expenditure of $34,980 would place the vessel in sound operable condition. From the sum of $311,813.72 this figure must be deducted.

As pointed out above, in August 1942 it would have cost approximately $115,000 to move the Maitland No. 1 to the Atlantic Coast and fit her for operation in salt water. Therefore, from the sum of $276,833.72 there must be deducted the amount of $115,000.

With these considerations in mind, we therefore find that the fair value of the Maitland No. 1 for its highest available and most profitable use for which it was adaptable at the time of its taking is $161,833.72. Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; Cameron Development Co. v. United States, 5 Cir., 145 F.2d 209, 210; Washington Water Power Co. v. United States, supra, 9 Cir., 135 F.2d 541, 543.

Against this amount the defendant is entitled to credit for the sum of $54,375 paid on June 10, 1944.

Plaintiff is also entitled to recover compensation measured by interest at 4 percent per annum for delay in payment on $161,833.72 from August 20, 1942, to June 10, 1944, and on $107,458.72 from June 10, 1944, to date of payment.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

I am unable to agree with the judgment of the court.

The amount is arrived at by taking the average earnings of the vessel from 1916 to 1932 and capitalizing them at 10 percent, and then deducting therefrom the difference in its remaining useful life when used in salt water and in fresh water, and also the cost of reconditioning it, and the cost of transporting it to the Florida east coast. This is an improper basis, I think, because at the time of its requisition it was earning nothing and had earned nothing for quite a long time. Had it been requisitioned during its earning period its earnings would have been a proper matter to take into consideration, but I do not think this is proper

where it was requisitioned long after its earning power had ceased.

Nor do I think the price at which comparable vessels sold on the Florida east coast is a proper basis for determining just compensation, because it presupposes that the owner of this vessel on the Great Lakes would have been able to sell his vessel after he had transported it down there, and there is no showing whatever it would have been able to do so. I feel quite sure that plaintiff would not have gone to the expense of $115,000 to transport the vessel to the Florida east coast in the hope of finding a purchaser there. Just compensation is to be determined not only as of the time of the taking but also as of the place of taking. United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55; United States ex rel. and for Use of Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390, cited in majority opinion.

The majority opinion shows that the sale price on the Great Lakes of similar vessels, which had likewise become obsolete for the use for which they had been originally constructed, ranged from $24,000 to $65,000. The War Shipping Administration fixed $72,500 as just compensation. I do not think the plaintiff has carried the burden of showing that this was incorrect. If plaintiff had undertaken to dispose of its vessel on the Great Lakes it seems improbable that it could have secured any greater sum.

MADDEN, Judge, concurs in the foregoing opinion.