# UNITED STATES *v.* TORONTO, HAMILTON & BUFFALO NAVIGATION CO.

No. 39.   Argued November 9, 1949.—Decided December 12, 1949.

*Paul A. Sweeney* argued the cause for the United States. With him on the brief were *Solicitor General Perlman* and *Assistant Attorney General Morison.*

*Gerald E. Dwyer* argued the cause for respondent. With him on the brief were *Frederick L. Wheeler* and *C. Austin White.*

MR. JUSTICE CLARK delivered the opinion of the Court.

We are faced again with elusive questions of property valuation in determining whether the United States awarded "just compensation" under the Fifth Amendment when it took the respondent's car ferry, the *Maitland No. 1,* under the authority of § 902 of the Merchant Marine Act of 1936, as amended, 53 Stat. 1254, 1255, 46 U. S. C. § 1242. The Government requisitioned the vessel in 1942, and determined its fair value as $72,500. In 1943, respondent exercised its option to accept 75 per

cent of the award, and in 1945 brought action in the Court of Claims to recover $711,753 as the additional amount necessary for just compensation. The Court, two judges dissenting, held that the fair value of the *Maitland* was $161,833.72, more than twice the Government's original determination. 112 Ct. Cl. 240, 81 F. Supp. 237. We brought the case here on certiorari, 336 U. S. 965, because it presents problems of difficulty and importance in the practical application of the general standard of just compensation.

The facts were found by the Court of Claims. They must be stated in some detail.

1. The *Maitland No. 1* was a conventional, steel-hull, two-stacker, twin-screw ferry for railroad cars, built in 1916. Until 1932 she plied across Lake Erie between Ashtabula, Ohio, and Port Maitland, Canada. She was respondent's only ship on that route, and her principal cargo was coal for a steel company in Hamilton, Ontario. On the Canadian side, respondent's connecting rail line moved the coal to destination in Hamilton. But a more convenient route on Lake Ontario caused a sharp decline in respondent's traffic beginning in 1928. And when the "new Welland Canal" between Lake Erie and Lake Ontario was opened in 1932, and larger ships carried the load directly to Hamilton, respondent abandoned the line. From 1932 to 1935 the *Maitland* was laid up at her dock in Ohio.

On November 29, 1935, respondent chartered the ship at an unspecified rate to a company ferrying freight across Lake Michigan, and thereafter, for the convenience of the parties, title was transferred to the Lake Michigan concern. The transfer recited a total consideration of $166,000 and included a "recapture" clause. On December 15, 1937, this right was exercised and upon payment of $92,894.80 the *Maitland* was returned to Ashtabula where she lay until requisitioned in August, 1942.

2. *Cost, book and scrap value, upkeep and earnings of Maitland.*—The *Maitland* was built in 1916 at a cost of $362,800. Respondent, a wholly owned subsidiary of the New York Central and Canadian Pacific Railways, acquired her from respondent's own president in that year, paying $394,560. From 1917 to 1930, respondent spent $38,115.46 for "additions and betterments to the vessel." Repairs from 1922 to 1932 amounted to $20,329.11 per annum. Lay-up expenses from 1938 to 1942—there is no evidence for earlier years—averaged $2,700 per year, including repairs. It would have cost the Government some $35,000 to place the ship in operating condition in 1942.

Her insured valuation in 1942 was $100,000; her scrap value $13,500. We do not know the reproduction cost at that time. Book value, figured at original cost less depreciation at one per cent for each of the first three years and four per cent per annum for the remaining period was $75,509.51. The earnings varied during the years she was operated by respondent. The average annual net operating income through December 31, 1920, was $17,216.28; both 1921 and 1922 operations found a deficit, while for the next five years net profit was at its highest level, averaging $129,893.92 per annum. 1928 and 1929 were progressively bad years and the next two and one-half years showed losses averaging $15,417.82 per year. In June 1932 the traffic was so poor that the vessel was docked and her operation never resumed. The Court of Claims found that the average annual net profit for the entire period of operation, ending in 1932, was $42,816.36, amounting to a return of 10.41 per cent per annum on the original investment.

3. *Sales of other vessels of like class on Great Lakes.*—After 1930, ships of the *Maitland* type were obsolete and not in demand as railroad car ferries on the Great Lakes. Construction of the "outer belt" railroad around the Chi-

cago yards and abolition of a rate differential made all-rail transportation, or movement on larger and more modern ferries, more practical for shippers.

But the Court found that in 1942 "there were a number of secondary uses for the vessel for which a demand did exist at that time" for use on the Great Lakes. Conversion to automobile ferry was relatively simple and economical; and the Court found that three sales of similar vessels had occurred from 1936 to 1940 for that use. The prices ranged from $25,000 to $65,000, but conversion and repair costs were greater because of the age and maintenance record of the vessels.

Two other vessels that were built from the same plans as the *Maitland* were sold for use on the Great Lakes in 1940 and 1942, for conversion as bulk carriers of pulpwood. Sale prices were $24,000 and $37,724.04, respectively. Neither of these vessels, however, was in the state of repair of the *Maitland*. One had been built in 1903, the other in 1910.

4. *Sales of vessels of like class for car ferrying on Atlantic Coast.*—While there was a finding that in "1942, there was a demand for a vessel such as the *Maitland No. 1* for use as a car ferry between Florida and Cuba," there was no finding that this "demand" had reflected itself in the Great Lakes market. The *Maitland* was not equipped to operate in salt water and it would have cost "not less than" $115,000 so to equip and move her to Florida, not including necessary strengthening for ocean service. There is no finding that respondent would have been able to sell the vessel had it been transported to Florida, nor that successful operation there was possible.

The Florida "demand" seems to have been predicated upon five sales of four vessels between 1941 and 1945. Only one ship, the *Grand Haven,* was sold while on the Great Lakes, and that was not until after hostilities ended in the last war. She was smaller but faster than the

*Maitland,* and brought a $50,000 price. She was floated down the Mississippi to the Gulf at "considerable expense." We know neither this amount nor the amount needed for repairs.

The other four sales were of vessels very similar to the *Maitland,* built between 1914 and 1920; but, unlike the *Grand Haven* and the *Maitland,* these ferries were operating on the Atlantic coast and were originally constructed for ocean travel. The sale prices were $100,000 and $170,000 for one vessel, the *Henry M. Flagler,*[1] and $332,-500 each for the two others.[2] The latter two required about $20,000 each for repairs. All three vessels were "purchased" by the United States after requisition.

The Court of Claims, finding that "the property condemned" was "unique, . . . peculiarly situated" and without relative comparison on the Great Lakes, concluded that the *Maitland* was worth more than "the residual value of an obsolete car ferry," thus requiring resort to "a consideration of the earnings . . . , in conjunction with the contemporaneous transactions in vessels of close similarity in determining a fair value." It called "the average mean residual value of an obsolete car ferry" $50,000; "attributing this value to the *Maitland,*" the capitalized value of an annual income comparable to that of the *Maitland* for the sixteen years ending in 1932 was the figure of $389,767.15, "according to actuarial tables in evidence." The court then deducted the percentage difference between the life expectancy of the vessel in fresh and salt water (20%), the cost of conversion to salt water and sailing it to Florida, and the necessary

---

[1] The first sale was in May 1941 to a private party who had thereafter spent $63,820 for necessary repairs. The second sale was on requisition, July 28, 1941, by the War Shipping Administration.

[2] These vessels, the *Joseph R. Parrott* and the *Estrada Palma,* were requisitioned by the War Shipping Administration in June, 1942.

repairs. Under this formula, $161,833.72 was the fair value "for its highest available and most profitable use for which it was adaptable at the time of its taking."

Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules. Suffice to say that the balance between the public's need and the claimant's loss has been struck, in most cases, by awarding the claimant the monetary "market value" of the property taken. See *United States* v. *Miller,* 317 U. S. 369, 374 (1943). Usually that is a practical standard; usually that approaches the "just" compensation demanded by the Fifth Amendment.

At times, however, peculiar circumstances may make it impossible to determine a "market value." There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. We then say that there is "no market" for the property in question. But that does not put out of hand the bearing which the scattered sales may have on what an ordinary purchaser would have paid for the claimant's property.[3] We simply must be wary that we give these sparse sales less weight than we accord "market" price, and take into consideration those special circumstances in other sales which would not have affected our hypothetical buyer. And it is here that other means of measuring value may have relevance—but only, of course, as bearing on what a prospective purchaser would have paid.

We agree with the Court of Claims that in this case there was no Great Lakes "market" in the sense discussed above. We hardly think that five sales of dissimilar ves-

---

[3] Considerations which might affect our rulings in this case if the cause were tried to a jury need not concern us here.

sels require a finding that any one of the varying prices would have been repeated had the *Maitland* been offered for sale. And so we are in basic agreement with the court below that other measures of value may be relevant.

But there are few of these substitute standards which are in fact of assistance in assessing the value of the *Maitland*. Original cost is well termed the "false standard of the past"[4] where, as here, present market value in no way reflects that cost. So with reproduction cost, when no one would think of reproducing the property.[5] And past earnings are significant only when they tend to reflect future returns.[6] We see no relevance in the *Maitland's* earnings between 1916 and 1932 on the issue of capacity to earn after 1942, on the Great Lakes or elsewhere. On this record they are entirely too remote to bear on the vessel's value when taken. It follows that the Court of Claims' reliance upon earnings was error.

We have said that the absence of "market" price does not, *ipso facto,* rid isolated contemporaneous sales of all relevance. None of the evidence upon which the findings below were based is before us, but it seems likely that

---

[4] E. Schmalenbach, Finanzierungen, pp. 4–6 (3d ed., Leipzig, 1922), quoted in 1 Bonbright, Valuation of Property 147, n. 9 (1937). "It is the property and not the cost of it that is protected by the Fifth Amendment." *Brooks-Scanlon Corp.* v. *United States,* 265 U. S. 106, 123 (1924). But see Bonbright, *supra,* ch. VIII.

[5] See 1 Report of Proceedings of the Advisory Board on Just Compensation 170 (United States Maritime Commission, War Shipping Administration, mimeographed, 1943). Cf. *Standard Oil Co.* v. *Southern Pacific Co.,* 268 U. S. 146 (1925); *The Hisko,* 54 F. 2d 540 (1931).

[6] See Orgel, Valuation Under Eminent Domain, ch. XIV (1936); 2 Nichols, Eminent Domain § 446 (2d ed. 1917); *The I. C. White,* 295 F. 593, 595, 596 (1924). As to the separation which must be made, in any case, between the value of the property and the value of the claimant's own business skill, see *Kimball Laundry Co.* v. *United States,* 338 U. S. 1 (1949).

the differences between the *Maitland* and ships sold on
the Great Lakes between 1936 and 1942 may be calcu-
lated with some degree of accuracy. And the circum-
stances may indicate the relevance of the *Maitland's*
insurance valuation. See Rule 3, Advisory Board on
Just Compensation, 1943 A. M. C. 1443, 1444. But cf.
*Westmoreland C. & C. Co.* v. *Public Service Comm'n,* 293
Pa. 326, 331, 142 A. 867, 869 (1928); Report of Pro-
ceedings of the Advisory Board, *supra,* pp. 152–153.

We have yet to consider the weight given to what
the Court of Claims called Florida "demand." The ques-
tion is whether Florida prices may be considered at all
in determining value when the *Maitland* was taken on
the Great Lakes.

Two cases in this Court, both involving the requisition
of coal, have stated the rule that where "private property
is taken for public use, and there is a market price pre-
vailing at the time *and place* of the taking, that price
is just compensation." *United States* v. *New River Col-
lieries,* 262 U. S. 341, 344 (1923); *Davis* v. *Newton Coal
Co.,* 267 U. S. 292, 301 (1925). (Emphasis supplied.)
We have held that in this case there was no "market"
on the Great Lakes; and so the quoted rule is in terms
inapplicable. But neither can a Florida market be es-
tablished on the evidence before us. And we have re-
minded the court below that it may consider individual
sales for use on the Great Lakes for what bearing they
may have upon the *Maitland's* value.

We take it that in the valuation of readily salable
articles, price at the market nearest the taking is, at
least in the usual case, a practical rule of thumb, and
one that is most likely to place the claimant in the
pecuniary position he occupied before the taking. Such
considerations seem to underlie a similar result in the
law of sales, and in the general law of damages. Thus,
in *Grand Tower Co.* v. *Phillips,* 23 Wall. 471 (1874),

the plaintiff had planned to sell the defendant's coal at the best available market on the Mississippi between Cairo and New Orleans. Yet the defendant's breach of contract to sell to plaintiff brought a "more direct" measurement of damages: the nearest available market. See *Harris* v. *Panama R. Co.*, 58 N. Y. 660 (1874); 3 Williston, Sales §§ 599, 599e (Rev. ed. 1948), and cases cited.

But we do not think a similar rule practical or fair in the requisition of property which most owners would, if possible, sell without geographic restriction. We doubt, for example, that owners of ocean liners would, under ordinary circumstances, fail to negotiate beyond the port in which the vessels lay—whether or not ocean liners are "goods" and subject to the law of sales.[7] Were market conditions normal,[8] we could hardly call an award "just compensation" unless relevant foreign sales, in available markets, were considered. See Supplementary Rules 1 and 3, Advisory Board on Just Compensation, 1945 A. M. C. 1382, 1383; *Glaspy* v. *Cabot*, 135 Mass. 435 (1883).

The question is of course one of degree, and we do not mean to foreclose the consideration of each case upon its facts. *Olson* v. *United States*, 292 U. S. 246, 255 (1934), relied upon below, makes this clear. This Court there stated that the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use

[7] See *Rivara* v. *Stewart & Co.*, 241 N. Y. 259, 264, 149 N. E. 851, 852 (1925), per Cardozo, J.; *Behnke* v. *Bede Shipping Co.* [1927] 1 K. B. 649. Cf. *Meering* v. *Duke*, 6 L. J. (o. s.) 211 (K. B. 1828) (Stamp Act).

[8] But see Report of Proceedings of the Advisory Board, note 5, *supra*, pp. 64–71.

affects the market value while the property is privately held." Mr. Justice Holmes had earlier warned that the prospective use may be considered "only so far as the public would have considered it"; the price was not to be "what a tribunal at a later date may think a purchaser would have been wise to give." *New York* v. *Sage,* 239 U. S. 57, 61 (1915).

On the record before us, the Court of Claims was in error in according weight to Florida values. Whether the problem is one of more profitable use or simply of a more advantageous price in a distant port, the burden is on the claimant[9] to show that it is likely that a prospective Florida buyer would have investigated the Great Lakes market and considered a ship like the *Maitland* while it was moored to its Ohio dock; or that the ordinary Great Lakes owner would have undergone the trouble and expense necessary to send his ship to Florida for a possible sale; or, finally, that either of these possibilities would have had an effect on price had the *Maitland* been sold on the Great Lakes. And the question is what the ordinary businessman in the trade would do, not what the owner claims he would do; a contrary rule would invite perjury, and would smack of the kind of special value which would not be considered by the ordinary purchaser. See *Grand Tower Co.* v. *Phillips, supra.*

A bare record reciting five sales, three to the United States, and but one on the Great Lakes for Florida use— and that after the war's end—does not meet the claimant's burden. But we leave the final question open for further consideration below. We do not mean to foreclose a finding, on substantial evidence not now before us, that there were probabilities of sale in Florida in 1942 sufficient to warrant consideration of demand there in fixing the

---

[9] *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 273 (1943).

value of the *Maitland*. We may add that the Court is clearly not bound to accept any geographic price range at full value.

This record, however, justifies neither of the valuation measures adopted below. The judgment is reversed and the cause remanded for further proceedings in the light of this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

Even though I join the Court's opinion in its general direction, the treacherous nature of the subject matter makes appropriate a separate statement of views.

Resort to the conventional formulas for ascertaining just compensation for the taking of property rarely bought and sold, and having therefore no recognized market value, does not yield fruitful results. The variables are too many to permit of anything except an informed judgment. Everything, therefore, turns on the process of judgment to the end that judgment be not based on standards too difficult of application or evidence too tenuous for solid inference.

It is this Court's duty to lay down standards for application by the lower courts. But since we are concerned with ascertainment of rather elusive values, those whose primary duty it is to make these estimates ought not to be cramped by rules that are too rigid and too artificial. If the questions presented to this Court in a particular case really turn, as they do here, on the relevance of data and the reasonableness of the inferences drawn from them in arriving at just compensation, the training and experience of the fact-finders become important.

If a jury is to make the valuation the area within which speculation may in the nature of things roam at large should be as narrowly confined as possible. See *Kimball Laundry Co.* v. *United States,* 338 U. S. 1, 20. But when the valuer is a court and particularly the tribunal that consists of judges to whom may fairly be attributed the expertness that comes from frequent dealing with the more elusive problems of value, it seems desirable for this Court to allow such tribunal considerable freedom from hard and fast rules in determining what data are relevant and what significance may be drawn from them. Barring obviously wrong criteria, or findings baseless in proof, experience counsels empiricism in dealing with these problems. And empiricism suggests sailing as close to the record of a particular case as possible. Only thus shall we avoid abstract pronouncements bound to distort or to be distorted by the case-by-case adjudicatory process especially appropriate in problems of this nature. Either lip-service will be paid such formulas while decisions are rooted in considerations outside them, or formulas not fitting practical circumstances will achieve impractical results.

In the light of this general approach the case before the Court comes down to this:

1. The starting point of the computation by the Court of Claims of the amount to be awarded for the Government's taking of the *Maitland* was capitalization of its earnings between 1916 and 1932. While we do not have the evidence that was before the court below, its findings disclose no reasonable relation between such earnings and the value of the vessel in 1942, the year of the taking, whether for use on the Great Lakes or in Florida waters. To permit such data to serve as a springboard for judgment is to leave too much temptation for unbridled speculation even by experienced judges.

2. In these days of quick mobility both for persons and property it would be an unjustifiably artificial rule to confine the worth of mobile property, as was the *Maitland,* to place value. Of course if there was an active market for property to be condemned at about the time and place of the taking, evidence of demand for special uses, or at other places, would not be helpful in seeking the general value of the property as against some unusual salability of the property, unusual either by reason of location or as a matter of use. Such evidence of atypical demand should be excluded not because it has no logical relevance but because such practical significance as it has is already reflected in current market prices. But here it was found that there was in fact no market on the Great Lakes for vessels like the *Maitland,* and, since what the United States got had to be translated into dollars and cents, there is no reason in sense and therefore none in law for excluding from consideration that there was a demand for vessels such as the *Maitland* for use as a car ferry between Florida and Cuba.

3. But such evidence must be critically used. It is one thing to exclude such evidence of demand at a distant place to which the property was transferable and quite another to assume that a finding that in 1942 there was such a demand is proof positive that the *Maitland* would have found a market in Florida and to base valuation on such assumption. Particularly is this true when the court below found that it would have cost at least $115,000 to transport the *Maitland* to Florida waters and to outfit it for salt-water use. The amount of this expenditure is more than the arithmetic measure of the difference in value between a vessel located in Florida and one on the Great Lakes. The risk to a profitable venture that the $115,000 expenditure implies casts doubt on the likelihood of the *Maitland's* use in the Florida trade. For the

greater the risk the smaller the impact of the opportunities of the distant market. The short of the matter is that for its difficult task of valuing the Court of Claims should not be confined either to acceptance or rejection of the Florida demand *in toto*. Like most problems in the law it is a matter of degree.

4. This Court should not go beyond indicating the broad lines for adjudication by the Court of Claims, leaving to that court discretion appropriate to its experience in applying the indicated standards to the facts before it. The analysis we have outlined must be fitted to facts not now before us.[1] I am not prepared therefore to specify as a matter of law what number of logically relevant sales do or do not meet the claimant's burden. After the Court of Claims has made additional findings in the light of this Court's decision it will be time enough to consider whether the data before it are too tenuous to permit solid inferences from them, as set forth in appropriate findings, regarding the weight which the Court of Claims may accord to the Florida demand.

---

[1] The evidence in this case could of course have been included in the record brought here under the Act of May 22, 1939, 53 Stat. 752, amending § 3 (b) of the Act of February 13, 1925, 43 Stat. 936, 939. See also Rule 41 of this Court.