In the Matter of the CITY OF NEW YORK, Appellant-Respondent, Relative to Acquiring Title to Real Property Bounded by West 155th Street and Other Streets in the Borough of Manhattan Required for Polo Grounds Area Project. W. GORDON COOGAN et al., Respondents-Appellants; NATIONAL EXHIBITION COMPANY, Respondent.

First Department, November 17, 1966.

*Milton H. Harris* of counsel (*Seymour B. Quel* with him on the brief; *J. Lee Rankin, Corporation Counsel*), for appellant-respondent.

*Henry L. King* and *Robert I. Millonzi* of counsel (*Davis Polk Wardwell Sunderland & Kiendl*; *Joseph T. Arenson*; *Diebold & Millonzi*; *Philip G. Reilly,* attorneys), for respondents-appellants.

*David W. Peck* of counsel (*Henry N. Ess, III, Loretta A. Conway, Cornelius B. Prior, Jr.,* and *Roger L. Waldman* with him on the brief; *Sullivan & Cromwell,* attorneys), for respondent.

*Per Curiam.* This appeal involves awards for the taking by eminent domain of the property known as the Polo Grounds. The subject property is familiar to practically every local inhabitant of mature years as the former home of the Giants. It consists of a stadium with adjacent parking lots, the whole comprising some 17½ acres — a plot practically unique as to size on the island of Manhattan. Other features of the land will be discussed below.

The claimants are members of the Coogan family who are the fee owners of the plot, and the National Exhibition Company who, at the time of taking, were the tenants in occupancy. The lease between the parties called for the erection of the stadium by the tenant. It further provided that the stadium would revert to the Coogans at the termination of the lease or the latter could require the tenant to demolish it at its own expense. Another significant provision was that in the event of condemnation any award for the land was to be the property of the landlord, any award for the stadium was to be divided 85% to the tenant and the balance to the landlord.

Special Term fixed the value of the land at $2,614,175. The city has accepted this valuation, but the Coogans appeal. Cer-

tain arguments based on the comparative return to the two claimants do not merit discussion, and we turn to the value claim made on their behalf. Claimants' real estate expert arrived at a value of $5,200,000. He reached this figure by first reaching the conclusion that the plot was suitable for middle-income housing and that a purchaser could be found because said purchaser would be able to finance the purchase and erection of buildings pursuant to the Mitchell-Lama Law. He then took the square-foot price paid by the purchasers of another baseball installation of comparable size, Ebbetts Field in Brooklyn, and, adjusting it to the size of the Polo Grounds, arrived at his value. We find insurmountable difficulties with these conclusions. Apart from the size of the plot, there is no resemblance between the two fields. The neighborhoods bear no resemblance to each other, the likelihood of success of middle-income housing projects on the respective sites is vastly different, and, of paramount significance, the soils comprising the two plots have little in common. The Polo Grounds is composed of land captured from the Harlem River. The earth covering is light. In most places excavation will strike water at six feet, and in some places at two feet. There was evidence that in the course of years the playing field sank to an extent where it was found necessary to raise it some four and a half feet. Even a structure as substantially spread out as this stadium has settled to a noticeable degree. Portions of the plot are subject to flooding when weather conditions cause a rise in the river. It is obvious that no substantial percentage of the plot will sustain multistory buildings without extensive use of pilings. Assuming that this is an engineering possibility, the enormous expense would certainly have an adverse effect on what a builder would pay for the land; and even publicly controlled financing would have qualms about lending for such a project. None of these vital factors finds reflection in the appraisal of claimants' expert. Without them we find no challenge to the correctness of the court's finding.

We have considered the testimony of the tenant's expert, Mr. McCann, on this subject although, strictly speaking, his evidence, being on a phase of the matter in which his claimant had no interest, can have little weight. His testimony in large degree supports the observations above of the impracticality of this parcel for middle-income housing. Instead, he valued the property for the use to which it hitherto had been put — which he considered the best use. Assuming this to be true, he failed utterly to explain why, over the entire period of upwards of 50 years that the land was so used, the highest rental it ever

earned was less than 2% of his valuation. Only two possibilities can explain this situation: either the tenant was paying less than a third of the proper rental in a situation where the landlord owned one of the very few properties large enough to accommodate the tenant's enterprise, or the appraisal figure is grossly exaggerated. The latter view is virtually compelled by the facts.

Special Term arrived at a value for the improvement on an estimate of reproduction cost less depreciation. The result was satisfactory to the claimant but the city has appealed. That the stadium is a specialty is incontestable. However, the city argues, with merit, that this does not necessarily mean that reproduction cost is the proper means of valuation. The theory supporting this method is that a like structure can neither be bought nor rented in the usual course of real estate transactions, and so the owner's only means of replacing it is to build another. But if the building, though a specialty, would not be replaced, reproduction cost ceases to be a measure of the owner's loss (*United States* v. *Toronto Nav. Co.*, 338 U. S. 396; *Matter of City of New York* [*Lincoln Sq. Slum Clearance Project*], 15 A D 2d 153, 172, affd. 12 N Y 2d 1086). While it is reasonably expected that sports stadia will be continued to be built, it is extremely doubtful whether this will continue to be done as a private enterprise. Significantly, while this claimant has the use of a stadium currently, the record shows that the stadium was publicly built, and the record further confirms what is generally known, that this has been the invariable practice in the cities where such stadia have been constructed in recent years. It is, of course, not essential that the claimant show that he intends to replace the structure but only that it would be reasonable to expect that it would be replaced. Whether this requirement is met by a showing that any replacement would not be a commercial venture but rather a governmental undertaking is open to some doubt. For the reasons indicated below, solution of this problem is obviated in this case by certain pragmatic factors.

The city contends that the stadium, by virtue of economic depreciation, has no value at all except as scrap, the value of which it places at $75,000. On the question of depreciaition Special Term applied a factor of 70% to cover physical and economic depreciation as well as obsolescence. Applying this figure to the expert's estimate of reproduction cost — with which no one appears to have any quarrel — the court arrived at the award of $1,724,714. Just how the 70% was arrived at does not appear. The over-all figure by the expert for physical

depreciation comes to 48%. Though it was conceded that the amounts or percentages of depreciation for obsolescence and economic depreciation are not susceptible of concrete proof, it is practically inconceivable that as little as 22% of the original cost would represent a fair allotment.

The stadium was built in 1911 and substantially increased and altered in 1922. It is not remarkable that many features such as escalators, certain facilities and the like are not found and that in other respects as well it would compare unfavorably with more recent erections. Of greater significance are the dearth of parking space and the fact that the sewage disposal system is now illegal and could be the subject of a costly violation. These factors of obsolescence are significant both on the cost of operation and the usefulness of the stadium.

But it is in the area of economic depreciation that the stadium really suffers. It was fairly established that the economic significance of a stadium of this kind is inextricably linked with its occupancy by a major league baseball team. It was constructed to house just that activity and without it could not possibly support its maintenance charges. Efforts to support a contrary conclusion had no substantial evidentiary support. And it is most persuasive that when this claimant moved its franchise to San Francisco, with an appreciable term of its lease remaining, it made practically no effort to lease the stadium for the occasional other activities that were used to supplement income, and which it is claimed prove economic value. It must be clear also that the franchise would never have been moved if it were not anticipated that a greater return would be realized by so doing. When it is considered that the move was made to a smaller city, where the team lacked the character of an institution which it enjoyed here, there must have been weighty considerations for it. And without attempting to state these individually, the sum total of the reasons is that the team had less drawing power while playing in that stadium, located in the neighborhood where it was and with its physical disadvantages — especially as those detracted from the comfort and convenience of the patrons — than in some other, more modern, stadium. The actions of the claimant speak louder than its arguments. We believe that these considerations raise the depreciation factor to well over 90% of its original value.

Admittedly it is difficult to arrive at a figure that is impervious to attack. The lease had some eight months to run. It could be said that the terms of the lease providing for the practical ownership of the stadium over a period of 40 years in return

for the cost of erection indicated the extent of its economic life as visualized by the parties to it when the lease was made. Events proved them to be unusually accurate. This would indicate a value for the remaining life of the structure of about $100,000. If to this is added its scrap value of $75,000, claimant should be amply compensated. When it is considered that, were it not for the windfall of condemnation coming when it did, this claimant would not have had anything and might be liable for substantial demolition costs at the option of the fee owner, the result is not inequitable.

Decree should be modified, on the law and the facts, by reducing the award for the improvement to $175,000, and otherwise affirmed, with one bill of costs to the City of New York against all claimants.

RABIN, J. (dissenting in part). I dissent in part and vote to affirm Special Term's valuation of the improvements. Special Term, in its well-reasoned opinion, stated as follows: "Considering all the evidence, including admissions against the interest of all parties, the location, condition of the property, prevailing conditions in the neighborhood, prevailing demands, as well as the uses to which the property could reasonably be devoted in order to obtain its greatest market value as a whole, the court finds that the best use of the land at title vesting was its actual use. It further finds that for that use the structures constituted an adequate improvement for the land."

I fail to see how, in the light of the record presented, that court could have arrived at a different conclusion. It is well supported by the evidence and we should not reverse these findings.

I need not say more than what was said by the Justice at Special Term. But, I would like to make a few observations in view of the position taken by the majority of this court.

The burden of the city's argument — and indeed it seems to be that of the majority — is that without the New York Giants the stadium was of no value. It may well be that without that distinguished tenant it would be worth less, but that is quite different from saying that the stadium, at the time of condemnation, was worthless.

The property was condemned in September of 1961. For the year 1960–1961 the city assessed the stadium at $525,000 (exclusive of parking lot fixtures and seats alleged to be worth $450,000). I do not believe that the city would have us think that it acted unfairly when it made that assessment. How then can it say that at the time of condemnation the stadium sud-

denly became worthless? There is nothing to show any change from the time the assessment was levied. The Giants had already left the premises. Indeed, the assessed valuation may be considered in the circumstances as an admission against interest on the part of the city. It should be noted that the relation of that assessment to the award is substantially the same proportionately as the relation of the 1960–1961 land assessment is to the land award which the city does not contest. Consistency can be a virtue even in condemnation proceedings and it might well be to the city's ultimate advantage to set an example in that respect.

The continued use of the stadium, immediately following its acquisition, hardly supports the city's position of worthlessness. Would the city under any circumstances have demolished the stadium immediately upon having taken title? Surely not. Indeed it is quite apparent that the city not only wanted, but needed the stadium — and it matters not for what reason. And it is also quite apparent that it was because of that need that the condemnation took place at the time it did — a most uneconomic step if indeed the stadium were worthless and about to be demolished.

The majority fixes the life of the stadium to be coextensive with the term of the lease. Such conclusion is not supported by the record. The tenant's expert witness estimated an indefinite life, conditioned upon good maintenance and replacement of wearable parts. Even the city's expert estimated its useful life to be 60 years from the date of its erection.

The majority rests its conclusion of a 40-year life upon what it seems to say was " visualized by the parties * * * when the lease was made." Of course, what the parties might have visualized at the time of the making of the lease is no indication of the period of actual usefulness.

However, there is no basis for concluding that when the original lease was signed the life of the stadium was visualized to be limited to the term of that lease. True, there was provision made for its possible demolition at the termination of the lease, but that was merely a contingency provided for by the careful drafters of the instrument.

There was no mandate in that document that the stadium be destroyed at the end of the term. It was left on a " wait and see " basis. There was just as much room for anticipation of a life long beyond the term of the lease, as there was an expectancy that it could serve no useful purpose after expiration of that term. The careful and conservative drafters of the lease made provision for both. It should be noted that the Coogans, the

landowners, as late as 1959, and at a time when the parties could " see ", did not seem to think that the stadium was in its last days. They then protested the proposed plan to replace it with a housing development, predicting for the stadium a renewed and long life as the focal point of a great center of sports — a home for football, soccer etc. Nor did the city think in terms of the demise of this stadium at the termination of the lease. If it had so thought there would have been no economic justification for the taking just eight months prior thereto with the prospect of attendant costs of demolition and a possible award for its taking. On the contrary, both the land-owner and the city thought of the stadium in terms of its con-tinued use after the term of the lease. And it was so used. In support of its contention that the stadium was useless, the city points to the fact that there were insufficient facilities for park-ing. That did not seem to be an obstacle to its successful opera-tion by the " Mets " under the lease given to that organization by the city upon its having acquired title. If indeed there had been too little parking space, the testimony indicates that the situation could have been cured by construction of garage facilities. Moreover, it hardly becomes the city to present that argument after the city had previously condemned part of the parking space originally used in conjunction with the stadium. It may not destroy and then attempt to capitalize on the results of such destruction. However, as indicated, the objection, if indeed it had any merit, was not a fatal one.

I think it is thus quite evident that the city condemned the Polo Grounds at the time it did for its needed use as a sports' field. Consequently, speculation as to what was the best use that the property could be put to was unnecessary and imma-terial. Be that as it may, the evidence strongly sustains the court's finding that the best use of the property was for a sports' field. The expert for the Coogans testified — contrary to the position taken by the Coogans shortly before condem-nation — that the property could be best used for a housing development. The city took issue with that and it has not changed its position.

On behalf of the city, it was testified that the property could be used for light industry. However, the city's expert conceded that such conclusion was based largely on speculation. The court found that the best use of the land was for what it was then being used, i.e., a sports' center. That conclusion is strongly supported by the evidence and there is no justification to disturb it.

Compensation therefore should be given for the improvements, as such, at their value at the time of the taking.

The city's expert gives the stadium a value of $75,000. Unless the stadium was really worthless at the time of condemnation there is no justification for that figure. The majority adds $100,000 to that unsupportable amount by the application of a formula — as novel as it is ingenious, but which I think is unsound. It is founded upon a speculative assumption of fact; the application of erroneous principles of law and the utilization of improper basic figures.

It is premised upon the assumption that the life of the stadium can be only as extensive as the term of the lease. In other words, that at the time of the condemnation it had but 8 more months of usefulness. As heretofore indicated, the evidence does not support such a conclusion. Consequently, the use of the 8-month period as a factor in determining the value of the lease is improper. The value of an improvement depends upon well-known factors, chief among which are its usefulness and the prospect of economic survival. The unexpired portion of this tenant's lease is not one of those factors. Parenthetically, the tenant does not ask for any award for the unexpired portion of its lease. The award is total — to be allocated between the owner and the tenant in accordance with their agreement and not at all dependent on the period of the lease that remained at the time of acquisition.

The sum of $1,724,714 arrived at as the value of the improvements (including fixtures) is indeed a modest one. Nobody contested the estimate of the reproduction cost as testified to by the tenant's expert. Notably there seems to be agreement that it was underestimated. Unless the court found the stadium to have outlived its usefulness it could not have deducted much more than the 78% which it deducted for depreciation, plus economic and functional obsolescence. But the court did not find the stadium to have outlived its usefulness. It justifiably found to the contrary. How can we, on this record, find differently? The award for the improvements should be confirmed.

McNALLY, J. (dissenting, in part). The court found that the highest and best use of the property was as a stadium. The property consists of 17.2 acres and is one of the largest parcels of real estate in the Borough of Manhattan under one ownership. The record supports land value for stadium use at $5.28 per square foot. Accordingly, I dissent, in part, and vote to increase the award to the owners from $2,614,175 to $3,950,000,

predicated on $5.28 per square foot. (*Matter of City of New York* [*A. & W. Realty Corp.*], 1 N Y 2d 428.)

BOTEIN, P. J., and STEUER, J., concur in *Per Curiam* opinion; RABIN and McNALLY, JJ., dissent in part in separate opinions.

Final decree modified, on the law and the facts, by reducing the award for the improvement to $175,000, and otherwise affirmed, with one bill of costs to the City of New York against all claimants. Settle order on notice.