UNITED STATES of America,
Appellant,

v.

STATE OF MARYLAND, for the Use of
Mary Jane MEYER, et al., Appellees.

UNITED STATES of America,
Appellant,

v.

STATE OF MARYLAND, for the Use of
Vance Lewman BRADY, widow,
et al., Appellees.

UNITED STATES of America,
Appellant,

v.

CAPITAL AIRLINES, INC., a Corporation, Appellee.

Nos. 16953–16955.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 27, 1963.

Decided June 13, 1963.

Danaher, Circuit Judge, was of opinion that evidence sustained trial court's conclusion as to loss of airplane owner.

Mr. David L. Rose, Atty., Dept. of Justice, with whom Acting Asst. Atty. Gen. Joseph D. Guilfoyle, Messrs. David C. Acheson, U. S. Atty., Morton Hollander, John G. Laughlin, Jr., and Enoch E. Ellison, Attys., Dept. of Justice, were on the brief, for appellant.

Mr. Richard W. Galiher,* Washington, D. C., with whom Mr. William E. Stewart, Jr., Washington, D. C., was on the brief, for appellees.

Before FAHY, DANAHER and BURGER, Circuit Judges.

FAHY, Circuit Judge.

A mid-air collision occurred over Maryland between a jet plane owned by the United States, and used by the Maryland Air National Guard, and a passenger plane of Capital Airlines. The passengers and crew in the Capital plane were killed and the plane was destroyed. A passenger in the jet plane was also killed. The only other occupant of the jet plane was its pilot, Captain McCoy, who was ejected and came down safely by parachute.

The survivors of the pilot and copilot of the Capital plane sued the United States under the Federal Tort Claims Act. Capital also sued the United States under the same Act for damages due to loss of its plane. Negligence of the jet pilot was found at trial and judgment against the United States was entered for all plaintiffs. The United States appeals, but confines its contentions to questions involving the availability to plaintiffs of the Federal Tort Claims Act and the amount of damages awarded Capital for loss of its plane. Neither negligence on the part of Captain McCoy nor the amount of damages awarded to the individual plaintiffs is now contested.

Liability of the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), set forth in the margin,[1] de-

---

* Mr. Louis G. Davidson and Mr. Peter J. McBreen, Chicago, Ill., participated on the briefs.

1. "Section 1346. United States as defendant.
"(b) Subject to the provisions of chapter 171 of this title, the district courts

pends upon whether the jet pilot was an "employee of the Government" at the time of the accident, and, if so, was "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," which was Maryland.

Upon the basis of abundant evidence, followed by elaborate findings and conclusions, the District Court answered these questions in favor of plaintiffs. We think this answer was correct.

The Air National Guard of Maryland is part of the State Militia referred to in Article I, Sec. 8, of the Constitution. Congress is there empowered "to provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States * * *." Clause 16 of Sec. 8. Article I reserves to the States the appointment of the officers and the authority of training the Militia according to the discipline prescribed by Congress. At all times relevant to this case the Maryland Air National Guard had not been called into the actual service of the United States.

In order to improve the national defense Congress has extensively legislated and appropriated funds with respect to the Militia, which is organized, equipped and disciplined in accordance with Federal standards, though trained and officered by the States. Important equipment is supplied by the United States. The airplane operated by Captain McCoy when this accident occurred was owned by the United States. 32 U.S.C. § 710 (a). It had been allocated by the United States to the Maryland Air National Guard. It was maintained by personnel paid by the United States for that purpose, known as civilian air technicians, and also known as caretakers.

Captain McCoy was paid by the United States pursuant to 32 U.S.C. § 709(a), "to care for" this property. This pay was in addition to his National Guard compensation. See 32 U.S.C. § 709(b). The United States fixed the salary of those authorized to be "employed" as was Captain McCoy. 32 U.S.C. § 709(f) (Supp.1962). Air Force regulations recognize this basic authority for the employment of civilian personnel. Employment under this authority is delegated to state adjutant generals, "subject to the provisions of law and such instructions as may be subsequently issued" under United States authority. Air National Guard Regulation No. 40-01, 20 Dec. 1954. The exercise of this authority is manifested by the Air National Guard Civilian Personnel Manual, issued 1 March 1958 "By Order of the Secretary of the Air Force" of the United States. The Manual prescribes *inter alia* the duties of civilian personnel in the Air National Guard in the situation of Captain McCoy. It also describes the qualifications, duties and responsibilities of positions which include those of "maintenance supervisor" and "aircraft maintenance chief."

Captain McCoy was also an officer of the National Guard of Maryland, commissioned by the Governor. He was assigned to 104th Fighter-Interceptor Squadron of the Maryland Air National Guard as "aircraft maintenance officer." This was in addition to his civilian job as "base maintenance supervisor," or "aircraft maintenance chief." Among his responsibilities was that of flight-testing of aircraft. This was ac-

---

\* \* \* shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any em-

ployee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

complished by flights called "proficiency flights" which, however, had multiple purposes, including evaluation of maintenance of the equipment, which was a responsibility of Captain McCoy in his employment under 32 U.S.C. § 709.[2] At the time of the flight that ended in this accident, which occurred on a Tuesday, Captain McCoy's pay status was that of an air technician, a status he bore throughout his normal work period of from eight a. m. to 4:30 o'clock p. m. during the week days. He was actually paid the day of the accident as an air technician, and such pay continued during his disability following the accident.

On this particular flight Captain McCoy was accompanied by the passenger who lost his life. This passenger was interested in joining the Air National Guard and in obtaining flight training. Captain McCoy indicated this to the Commander of the 104th Squadron, who concurred that the passenger could accompany Captain McCoy on the flight. The Commander gave permission for the flight. He explained the reasons for doing so as follows:

"A. The general reason for any flight of this nature is proficiency. You don't set up a flight for the express purpose of taking any individual up, the express purpose for flying is for your own general proficiency. If there is a seat available and the man qualifies in accordance with the regulations, it is permissible to take him up on that flight. The Air Force does it all the time.

"Q. Were there other reasons for the flight in question? A. I think as I mentioned before, a third reason for any flight is to insure that the equipment is in proper working order, to—well, as a result of each flight the maintenance officer takes, he has to fill out a form, whether the aircraft was okay, or whether it had even minor discrepancies which would be listed in the form. When he lands and comes back from the flight, this is done; so there is a third reason for the flight, which is to insure the proper maintenance of the equipment which he has general supervision over.

"Q. As an aircraft technician? A. As an aircraft maintenance officer in the squadron and also as an air technician."

We hold with the District Court that in his civilian capacity as a caretaker of property of the United States Captain McCoy when on this flight, which entailed the performance of his caretaker and maintenance duties, was an employee of the United States within the terms of the Federal Tort Claims Act. See United States v. Holly, 192 F.2d 221 (10th Cir., 1951); Elmo v. United States, 197 F.2d 230 (5th Cir., 1952); United States v. Duncan, 197 F. 2d 233 (5th Cir., 1952); Courtney v. United States, 230 F.2d 112, 57 A.L.R.2d 1444 (2d Cir., 1956); United States v. Wendt, 242 F.2d 854 (9th Cir., 1957).[3] He was so employed to assist the National Guard, but also to assist the United

2. It appears that flying these planes involved both a military and a civilian check on the plane's maintenance because of Captain McCoy's dual role, although it also appears that only personnel militarily qualified are permitted to fly the planes and that military pay can be awarded for such flying.

3. But see also the later case of Pattno v. United States, 311 F.2d 604 (10th Cir., 1962), cert. denied, 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963), where the caretaker was held not within the Federal

Tort Claims Act, the court concluding that when the accident occurred he was flying on a training program to evaluate the skill of another. We think this case distinguishable from the present case on the findings of the District Court, supported by the evidence, that the flight was within the caretaker function when the accident occurred.

In Storer Broadcasting Co. v. United States, 251 F.2d 268 (5th Cir., 1958), the court said the only question presented was whether a member of the National Guard "who is not a caretaker" and not

States. In his property maintenance function he was paid by, and the ultimate right of control over him was in, the United States. The functions lodged by the United States in the State Adjutant General did not serve to supplant this right of control in the United States, though it may be said to have been ancillary thereto. Such supervision as was lodged in the State did not make Captain McCoy an employee of Maryland. A foreman, for example, is not the employer of the one whose work he may in some respects supervise. There is of course a close relationship between the State of Maryland and the United States in the maintenance of federal property allocated to the Maryland National Guard, but this does not tip the balance toward the State on the issue of employment; for too much begins and remains with the United States in the case of these caretakers of federal property.

Perhaps the status of Captain McCoy can be described as an employment divided between Maryland and the United States, varying in relative amounts at different times and in different circumstances. But, in an ultimate sense the right of control was in the Federal Government at the time and in the circumstances of this accident, notwithstanding immediate authority or permission for the flight was given by the State through its militia officers. While such personnel are not within the Federal Civil Service the Federal Bureau of Employees' Compensation of the Department of Labor considers them to be federal employees entitled to compensation benefits under the Act it administers.

The United States contends that Congress, since the events in this case, has rejected the effort to extend the coverage of the Federal Tort Claims Act to members and civilian employees of the National Guard. Reliance for this contention is placed upon 74 Stat. 878 (1960), 32 U.S.C. § 715 (Supp.1962) and its history, including H.R.Rep.No.1928, and S.Rep.No.1502, 86th Cong., 2d Sess. (1960); U.S.Code Congressional and Administrative News 1960, p. 3492 et seq. We can by no means agree with this contention insofar as it bears upon the status of persons employed as civilians under 32 U.S.C. § 709. The Government's reference in its brief to the statement in the letter of the Deputy Attorney General to the Chairman of the Senate Committee on the Judiciary, set forth in the Senate Report, "To divorce responsibility from control is to forego any rational legal basis for payment," clearly misses the significance of the position of the Deputy Attorney General insofar as the present case is concerned. The thrust of his objection to the proposed legislation, S. 1764, 86th Cong., 2d Sess. (1960), which would have amended the Tort Claims Act as to both classes of persons, was that it would change existing law as to federal liability for acts of Guardsmen when on regular training duty under State control. As to the provision expressly including civilian caretakers under the term "employees of the Government," his position was that it was unnecessary because it would merely restate existing law.[4]

This distinction between members of the National Guard and men employed

---

in the active service of the United States is an "employee of the Government" within the meaning of the Federal Tort Claims Act.

4. As to federalized National Guardsmen and Section 709 employees the Deputy Attorney General stated:

The same rationale that looks to the controlling organization holds that when National Guardsmen are actually under the control, in whole or in part, of regular Army or Air Force officers or other Federal personnel, the Government is liable for their negligence. In such instances, however, the proposed legislation would be unnecessary, for the Government's responsibility already exists under the present provisions of the Federal Tort Claims Act.

The provision which would expressly include within the definition of "employee of Government," civilian employees of the National Guard who perform caretaker functions with respect to the National Guard's military equipment, and are separately paid for such services under title 32, United States Code, section

# 1014

pursuant to Section 709 appears also in the Hearings Before Subcommittee No. 2 of the House Committee on the Judiciary, 86th Cong., 2d Sess. Ser. 22 (1960), where the First Assistant, Civil Division, Department of Justice, with reference to Section 709 employees, made a statement in terms identical to those used by the Deputy Attorney General. Id. at 6 and 7. See note 4, supra.

The new statute, 74 Stat. 878, 32 U.S. C. § 715 (Supp.1962), though not adding to the coverage of the Tort Claims Act, creates authority in the Secretaries of the Army and Air Force to settle claims up to $5,000 arising out of National Guard activity even when the active agent is performing routine National Guard work under State control. And the active agent may be a Guardsman or a civilian employed under 32 U.S.C. § 709. Thus in one respect claimants are now in a better position than they were prior to passage of 74 Stat. 878 in 1960, in that they may successfully present their claims arising out of ordinary Guard activity such as training when the

actor has been a Guardsman even though such persons are not under federal control at the time. With respect to injuries caused by civilians employed under § 709 it would seem that the new statute creates a limited administrative recovery as an alternative to the traditional judicial one under the Federal Tort Claims Act.[5] However that may be, it is clear that as of the time here in question, 1958, the plaintiffs' remedy for injuries caused by civilian caretakers was under the Federal Tort Claims Act; and the history of this subsequent legislation supports this view. The fact that this caretaker was also an officer of the National Guard with other duties in that respect did not remove him from the federal employee status while he was actually performing the duties incident to that status.

Not only was the Captain an employee of the United States but he was also "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in ac-

709, is also unnecessary and thus objectionable, for the same reason. For it has already been held under the principles we have discussed in an unbroken series of court decisions that, because of the control relationship between such persons and the Federal Government (and its property), the latter is responsible for their torts under the present provisions of the Federal Tort Claims Act. Senate Report, supra at p. 11.

5. In reporting the bill out of which became 74 Stat. 878, and not the one originally proposed, the Chairman of the Senate Committee on the Judiciary, Senator Eastland, commented that administrative coverage was being given to claims arising out of injuries caused by Guardsmen since when in a non-federal status they had been held not to be employees of the United States within the meaning of the Federal Tort Claims Act. No such explicit comment was made with reference to § 709 civilians, although the Senator appended to his report a letter from the Secretary of the Army which acknowledged that the Courts of Appeals had held that injuries caused by these caretakers were cognizable under

the Federal Tort Claims Act since those employed under authority of § 709 were "employees of the Government" within the meaning of that Act. See S.Rep. No. 1502, 86th Cong., 2d Sess. 306 (1960). The Secretary cited these cases on the point: Holly v. United States, Elmo v. United States, Courtney v. United States, and United States v. Wendt, all supra at p. 6. And he went on to say that the view reflected in these cases was at variance with the position of the Comptroller General but that the Supreme Court had not considered the matter, thus giving rise to an uncertainty, in the view of the Secretary, as to the status of such employees under the Tort Claims Act. But the Secretary was quite certain that Guardsmen in a non-federal status were not covered since it had been so held, citing McCranie v. United States, 199 F.2d 581 (5th Cir., 1952), so that an administrative remedy was thought desirable—if any there was to be—instead of imposing a new kind of liability on the United States under the Tort Claims Act wherein liability is based upon *respondeat superior*. S.Rep. No. 1502, supra, at 6-7.

cordance with the law"[6] of Maryland where the negligence occurred. A private person in Maryland is liable for the negligence of his servant in the circumstances set forth in Keitz v. National Paving & Contracting Co., 214 Md. 479, 491, 134 A.2d 296, 301 (1957):

> "[T]here are at least five criteria that may be considered in determining the question whether the relationship of master and servant exists. These are: (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is a part of the regular business of the employer. Standing alone, none of these *indicia*, excepting (4), seem controlling in the determination as to whether such relationship exists. The decisive test in determining whether the relation of master and servant exists is whether the employer has the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done.* It will be noted from the above, it is not the manner in which the alleged master actually exercised his authority to control and direct the action of the servant which controls, but it is his *right* to do so that is important. Sun Cab Co. v. Powell, 196 Md. 572, 578, 77 A.2d 783 * *." [Emphasis in the original.]

The emphasis here is on the right of control, which, as we have seen, was in the United States, notwithstanding the particular flight could be said to have been under some supervision by the State as to its timing in relation to other activities at the airfield.

Since there is no question on the appeal as to the finding of negligence by Captain McCoy, nor of the amount of damages awarded to the individual plaintiffs, the judgments for the latter will be affirmed.

There remains the contention of the United States that the judgment of $1,210,000 awarded to Capital Airlines, Inc., due to complete demolishment of its airplane, was excessive. The court arrived at this amount because of its view that the evidence showed Capital could make itself whole only by purchasing a new airplane of the same type, no used airplanes of the type being available, and the evidence showed that a new plane would cost $1,210,000.[7]

The original cost of the plane was $1,074,020 in January, 1956. It had been in service for over two years when it was destroyed and was then about ready for overhaul. The evidence shows that some other airplanes, of a different version of the Viscount, had been sold when about two years old by Capital for several hundred thousand dollars less, per plane, than their original cost when new. And the record also shows that the destroyed airplane was carried on Capital's books at a depreciated value of some three hundred thousand dollars less than original cost. The trial court, as we have indicated, was more impressed by the fact that a replacement aircraft for the one lost could only be had from the makers, so that "new" price would have to be paid if an identical substitute were to be obtained. It is clear then that what was awarded was replacement value and not fair market value.

In the usual case—and we think Maryland is in accord—courts seek to compensate an injured party for its loss caused by the fault of another; and the loss in personalty is in terms of value at the time of the loss. An objective measure of value is usually meant, in other words what a willing buyer would

---

**6.** 28 U.S.C. § 1346(b).

**7.** The judgment was for $1,216,050, the difference of $6,050 being expense incurred by Capital, as to which item separately considered no objection is made.

have paid a willing seller in an arm's length transaction for the article in question just before it was lost, or, in other words, market value. United States v. Toronto, etc., Nav. Co., 338 U.S. 396, 70 S.Ct. 217, 94 L.Ed. 195 (1949); Boston Iron & Metal Co. v. S. S. Winding Gulf, 85 F.Supp. 806 (D.Md.1949); Bailey v. Ford, 151 Md. 664, 135 A. 835 (1927); McCormick on Damages § 44 (1935); 73 A.L.R.2d 722 (1960).

■ Sometimes fair market value cannot be determined, or would be inadequate, as when, for example, the article destroyed was unique or possessed qualities the special nature of which could only be appreciated by the owner. In such a case additional principles are helpful in determining proper compensation to the injured party. See McCormick, supra, § 45. In the case before us, however, both parties agree that the proper measure to be applied is fair market value. And replacement value— however probative it may or may not be in establishing market value—is not the equivalent of market value. Cf. Bailey v. Ford, supra; Chesapeake & P. Telephone Co. v. Public Service Comm'n, 201 Md. 170, 93 A.2d 249 (1952).

■ There was evidence from which the trial court could have found the fair market value of the airplane at the time of its destruction. Accordingly, the conclusion that Capital was entitled to replacement value was erroneous and must be reversed. On remand new findings on this aspect of the case may be made consistent with this opinion, with privilege to the parties of adducing additional evidence if the court in its discretion permits.

Judge DANAHER is of the opinion, however, that the evidence sustains the trial court's conclusion as to damages to Capital, deeming the situation here presented to be unique, and that we should not hold that the trial court should not have found as it did as to Capital's damages.

Nos. 16953 and 16954 affirmed; No. 16955 reversed and remanded.